Michael THOMPSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–00–00138–CR.

Court of Appeals of Texas, Tyler.

July 11, 2001.

Lajuanda Lacy, Tyler, for Appellant.

Ed Marty, for State.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

JIM WORTHEN, Justice.

Michael Thompson ("Appellant") appeals his conviction of capital murder, for which he received a mandatory life-sentence. Appellant raises two issues on appeal. We affirm.

### BACKGROUND

On July 1, 1999, Appellant traveled to Lake Palestine with friends and acquaintances, Hersain Gomez ("Gomez"), Susana Arroyo ("Arroyo"), Armando Hinojosa ("Hinojosa"), Christina Martinez ("Martinez") and Crystal A. Garcia ("Garcia").[1] The group traveled together in Hinojosa's car to Kiloland Park and spent the day drinking alcohol, smoking marijuana, swimming and listening to music. During the festivities, the victim, Jeffrey Adam Carrier ("Carrier"), drove up in a blue Honda Civic. The passenger, Aaron Warren ("Warren"), exited the vehicle and inquired generally of the group if anyone knew where he could buy some marijuana. Warren was told that no one had any marijuana for him to purchase, but if he returned later that evening, they would go to Tyler with him and help him find a dealer. Garcia testified that after Warren and Carrier left Kiloland Park, the group, *sans* Garcia, had a discussion, which she later discovered involved a plan to rob the two boys, Carrier and Warren.[2] The general consensus was that the boys would be beaten up and their money taken. Later that evening, the two boys returned to Kiloland Park as instructed.

Hinojosa's car battery was dead. Warren, Carrier and Appellant took Carrier's car to find jumper cables. While they were gone, the remaining members of the group, Garcia included, further discussed the plan to rob Warren and Carrier. At this point, Gomez stated that since the punishment was essentially the same for aggravated robbery, they might as well kill the two boys. Subsequently, Warren, Carrier and Appellant returned and were able to jump-start Hinojosa's car. The group and the two boys left Kiloland Park in two cars. Appellant, Gomez and Garcia rode in one car driven by Hinojosa. Carrier drove the other car, with Warren, Arroyo and Martinez as passengers. The group and the two boys first went to Kilo's liquor store, where Appellant purchased beer, cigarettes and a bag of Cheetos. The group and the two boys then left the liquor store in the same cars they had occupied previously.

1. The State of Texas (the "State") offered testimony that Gomez (a.k.a. Demon), Arroyo and Martinez were admitted members of the street gang known as Northside Crips. The State offered further evidence that Hinojosa (a.k.a. Popeye) and Garcia associated with the Northside Crips. According to the testimony offered by Garcia, Martinez also associated with street gangs other than Northside Crips. These individuals are referred to collectively as "the group."

2. Carrier and Warren are referred to collectively as the "two boys."

According to Garcia's testimony, the group in Hinojosa's car, including Appellant, further discussed the plan, which was to separate the two boys prior to robbing them. Garcia further testified that the fabricated reason to be given the two boys in order to separate them would be that Appellant's uncle would sell them the marijuana, but did not like large groups of people at his house. Therefore, Hinojosa, Appellant and one of the boys would leave the rest of the group and Carrier, knock on a stranger's door, purportedly Appellant's uncle, and inquire about purchasing marijuana. According to Garcia, Gomez again suggested that they kill the two boys. This was the first time Appellant apparently heard Gomez make this statement. Appellant objected, stating that since he was already facing charges for an aggravated assault, he could not afford any more trouble.[3] The two cars stopped on a street south of the Tyler city limits, where Gomez and Appellant left the group momentarily to urinate. The subject of their conversation, if any, while they were away from the group is unknown. When they returned, Carrier and Warren were told that they had passed the street on which Appellant's uncle's house was located and that they needed to double back. The apparent purpose of telling the two boys this was to find a more remote street.

The cars, containing the same occupants, drove on and turned down County Road 122. Shortly thereafter, the two cars stopped. Hinojosa and Appellant separated the two boys by taking Warren in Hinojosa's car in search of Appellant's fictitious uncle's house. The rest of the group remained with Carrier by his car. However, before Appellant and Warren departed, Gomez instructed Garcia to retrieve a knife from the passenger-side, seat-back

pocket of Hinojosa's car and to use it to puncture the tires on Carrier's car. Garcia did as she was told and, unbeknownst to Carrier, used the knife to puncture the two passenger-side tires of Carrier's car. The tires quickly deflated. Garcia handed the knife to Martinez and exclaimed to Carrier, "Say man, your tire is flat!"

Carrier, who was sitting in the driver's seat, exited his car and retrieved the spare tire and a pouch containing a tire iron and jack assembly from the trunk. Carrier then proceeded to begin changing the front, passenger-side tire. While Carrier was kneeling down to remove the flat tire, Gomez picked up the spare tire, held it over Carrier for a moment, then threw the tire down at Carrier's head. The tire struck Carrier, but he was not knocked to the ground. Carrier proceeded to defend himself against Gomez's attack. During the fight, Carrier was apparently getting the best of Gomez until Arroyo hit him twice with the car jack. Carrier fell to the ground and Gomez and Arroyo continued to beat him. At one point, Carrier struck Arroyo in the leg. Angered that Carrier had hit Arroyo, who was her cousin, Garcia kicked Carrier as he lay on the ground. Garcia then took the tire iron that lay by the car and hit Carrier multiple times in the shoulder with it.

Gomez and Arroyo then dragged Carrier, still conscious, from the roadside into the nearby wooded area. Garcia then proceeded to steal items from Carrier's car while Martinez attempted to wipe fingerprints from the car's exterior. Subsequently, Gomez called Garcia to the edge of the woods and Arroyo informed her that Carrier had given them his wallet. Garcia returned to the car only to be called to the edge of the woods once again. This time, Gomez told her to get the knife for him.

---

**3.** The testimony that Appellant was facing charges for aggravated assault was admitted over objection and is the subject of Appellant's second issue, which is addressed below.

Garcia retrieved the knife from Martinez and gave it to Gomez. Gomez used the knife to stab Carrier to death.

Subsequently, Hinojosa drove up in his car alone. Garcia and Martinez got into the car with him. Garcia and Martinez informed Hinojosa that Gomez and Arroyo had just killed Carrier. As Gomez and Arroyo approached, Garcia inquired as to the whereabouts of the knife, which she feared, if left behind, could be traced to her father. Hinojosa drove off to go pick up Appellant, leaving Gomez and Arroyo to search for the knife. When they reached Appellant and Warren, Hinojosa told Appellant to get into the car. Warren was told to get in on the other side. However, before Warren could get into the car, Hinojosa sped off, leaving Warren, who was still unaware that his friend was dead. During the drive back to Carrier's car, Appellant was told that Gomez had killed Carrier. According to Garcia's testimony, upon hearing this, Appellant exclaimed, "Oh, no! Oh, no, man! He can't do this to me! He can't do this to me, Mike D! No, man! I told Devil not to do nothing like that!" Upon returning to Carrier's car, the three picked up Gomez and Arroyo and proceeded to Appellant's house. During the drive to Appellant's house, Gomez expressed his willingness to go back and kill Warren as well so that there would not be any witnesses. However, despite Gomez's wishes, Hinojosa drove on to Appellant's house.

According to Garcia's testimony, once the group reached Appellant's house, they discussed how they might cover up the crime. There is testimony that Gomez threatened the group, but the nature of the threats is unknown. The group then left Appellant at his home and proceeded to Martinez's house, where Garcia and Martinez were dropped off. Appellant contacted the police and notified them of the murder. The police arrested Garcia, Martinez, Hinojosa and Appellant. Gomez and Arroyo are still at large and believed to be in Mexico.

Appellant was charged with capital murder of Carrier as a party to the offense. At trial, testimony was introduced, over objection, related to Appellant's tattoos supposedly symbolizing gang affiliation, as well as testimony that Appellant had objected to the murder because he was already being charged for an unrelated aggravated assault. The jury found Appellant guilty of the capital murder of Carrier and Appellant received a mandatory life-sentence.

### ACCOMPLICE TESTIMONY

Appellant contends that the testimony of Garcia is not sufficiently corroborated. We disagree. Texas Code of Criminal Procedure article 38.14 states that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon Supp.2001). In order to determine whether the accomplice witness testimony is corroborated, we must eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in evidence tend to connect the appellant to the offense. *See McDuff v. State*, 939 S.W.2d 607, 612 (Tex.Crim. App.1997). The non-accomplice evidence does not have to directly link appellant to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt; but rather, the non-accomplice evidence merely has to tend to connect appellant to the offense. *Id.* at 613. The accused's presence in the company of the accomplice before, during and after the commission of

the offense coupled with other suspicious circumstances may tend to connect the accused to the offense. *See Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex.Crim.App. 1996). A defendant's confession may be sufficient to corroborate the testimony of an accomplice, so long as proof of the confession does not depend upon the testimony of the accomplice. *See Farris v. State*, 819 S.W.2d 490, 495 (Tex.Crim.App. 1990).

In the case at hand, Appellant's videotaped confession, which was introduced at trial, establishes that he was in Garcia's presence before, during and after Carrier's murder. Appellant's testimony further establishes that he was generally in the presence of Gomez, Arroyo, Hinojosa and Martinez at all times except when Appellant left with the two boys to look for jumper cables, and when Appellant and Hinojosa took Warren to make the supposed marijuana buy. Further still, Appellant's confession establishes not only that Appellant and Hinojosa left with Warren in search of marijuana, but also indicates that Appellant was going to knock on someone's door who he did not even know and inquire about purchasing marijuana. According to Appellant, they planned to buy marijuana not from his uncle, but rather, from an aunt of one of the girls. However, Appellant's confession establishes that none of the girls present that evening accompanied Appellant, Hinojosa and Warren on the supposed marijuana buy. Appellant's participation in the separation of Warren and Carrier under the supposition that they were taking Warren to buy marijuana, considered in conjunction with the fact that Appellant's confession establishes that he did not even know from whom they were going to buy the marijuana qualifies as sufficiently suspicious circumstances tending to connect Appellant to the plan to rob the two boys.

Thus, after eliminating the accomplice witness testimony from our consideration and conducting an examination of the non-accomplice evidence, we conclude that such non-accomplice evidence does indeed tend to connect Appellant to the offense sufficiently to corroborate Garcia's testimony.

### APPLICABLE LAW AS SET FORTH IN THE COURT'S CHARGE

A person is criminally responsible as a party to an offense if the offense is committed by the conduct of another for which he is "criminally responsible." *See* TEX. PEN.CODE ANN. § 7.01(a) (Vernon Supp. 2001). A person is "criminally responsible" for an offense committed by the conduct of another if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. *See* TEX. PEN.CODE ANN. § 7.02(b) (Vernon Supp. 2001). A person commits a criminal conspiracy if, with the intent that a felony be committed: (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement. *See* TEX.PEN.CODE ANN. § 15.02(a) (Vernon Supp.2001). An agreement constituting a conspiracy may be inferred from the acts of the parties. TEX. PEN.CODE ANN. § 15.02(b) (Vernon Supp 2001). A person commits murder if he: (1) intentionally or knowingly causes the death of an individual. *See* TEX.PEN.CODE ANN. § 19.02(b)(1) (Vernon Supp 2001). A person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit rob-

bery. *See* TEX.PEN.CODE ANN. § 19.03(a)(2) (Vernon Supp.2001).

In his brief, Appellant concedes that Gomez murdered Carrier. Thus, our initial inquiry will focus on whether there is sufficient evidence to support the jury's finding that Appellant is criminally responsible as a party to that offense.

### LEGAL SUFFICIENCY

 Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S.Ct. 2781, 2786–787, 61 L.Ed.2d 560 (1979); *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex.App.—San Antonio 1999, no pet.). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim. App.1993). The evidence is examined in the light most favorable to the jury's verdict. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S.Ct. 2211, 2217–218, 72 L.Ed.2d 652 (1982). In the case at hand, in order to sustain a legal sufficiency challenge, we must conclude that a rational trier of fact could not have found the essential elements supporting that Appellant was a party to capital murder beyond a reasonable doubt.

 In order to determine whether Appellant was a party to the capital murder of Carrier, we must first consider whether or not there was legally sufficient evidence to support the jury's finding that there existed a conspiracy to commit rob-

bery and that Appellant was a co-conspirator. Garcia testified that there was an agreement among the members of the group to rob Carrier and Warren. Moreover, the record reflects that Appellant was aware of this agreement. The record further supports that the plan was to separate Warren and Carrier in order to aid in the commission of the robbery. It is further evident from the record that no member of the group ever objected to the commission of the robbery. Further, since the evidence does not indicate that any member of the group did anything but cooperate with the terms of the plan to commit robbery, we can infer that an agreement existed among the group members to commit robbery. *See* TEX.PEN. CODE § 15.02(b). Finally, there is evidence that, in accordance with the plan, the two boys were separated by being told that the marijuana could be purchased from Appellant's uncle, but that since Appellant's uncle did not like a lot of people at his house, the group would split up, and only Hinojosa, Appellant and Warren would go to Appellant's uncle's house to buy the marijuana. Splitting Warren and Carrier up was an integral part of the plan to rob the two boys, and thus, by physically separating the two boys, the group committed an overt act in furtherance of the conspiracy. Therefore, we conclude there to be legally sufficient evidence to have allowed the jury to find that Hinojosa, Garcia, Martinez, Gomez, Arroyo and Appellant engaged in a conspiracy to rob Carrier and Warren.

We next consider whether the evidence was legally sufficient to support the jury's finding that Appellant, as a co-conspirator, was criminally responsible for the murder of Carrier. Thus, the focus of our inquiry is first, whether Carrier's murder was committed in furtherance of the robbery of the two boys, and second, whether Carri-

er's murder should have been anticipated as a result of carrying out of the conspiracy to rob the two boys. *See* TEX.PEN.CODE § 7.02(b).

Appellant contends that the murder of Carrier was not committed in furtherance of the plan to commit robbery, but rather was committed because Carrier was successfully challenging Gomez in a fight. We disagree. The use or threat of force sufficient to cause *bodily injury or death* is implicit in the commission of robbery. *See* TEX.PEN.CODE ANN. § 29.02(a)(1) (Vernon Supp.2001). Since the object of the conspiracy was to commit robbery, it follows that the use of sufficient force to accomplish the robbery was part of the plan. The record indicates that Gomez, Arroyo and Garcia brutally attacked Carrier. This attack was initiated by Gomez, who hurled a tire at Carrier. Carrier attempted to defend himself against Gomez rather than submitting to Gomez's initial show of force. As such, if Carrier was to be robbed in accordance with the plan, it was then necessary for Arroyo and Garcia to join in the assault in order to overwhelm Carrier. Ultimately, Carrier was beaten down, dragged into the woods, relieved of his wallet and stabbed to death by Gomez. Analyzing this sequence of events, the jury could have logically found that Carrier's murder was a part of the robbery. Thus, we conclude that the evidence is legally sufficient to support the jury's finding that Carrier's murder was committed in furtherance of the robbery.

We next turn to the question of whether Appellant should have anticipated Carrier's murder as a result of the carrying out of the conspiracy to commit robbery. At trial, there was testimony that Gomez was an admitted member of the street gang, Northside Crips. There was also evidence that the Northside Crips had been known to conduct drive-by shootings, and had been involved in murders, aggravated robberies, aggravated assaults, robberies, assaults and other such activities. There was further evidence that Gomez had been tattooed with certain symbols indicating his gang affiliation. The record further reflects that Appellant had tattoos, which were very similar to Gomez's.[4] Further still, Officer Charles Barber testified that anyone with any kind of gang knowledge at all could have looked at Gomez's tattoos and determined that he was a gang member. There was further testimony that Appellant had known Gomez for several months. Moreover, the record reflects that Gomez suggested, in Appellant's presence, that the group kill the two boys. Evidence that Appellant objected to Gomez's statement tends to show that Appellant believed Gomez to be capable of murder.[5] Had Appellant not believed Gomez to be capable of murder, his objection to the suggestion of murder would have been unnecessary. Finally, the record reflects that when the two boys were split up, that Carrier was left with Gomez, Arroyo and Martinez, all admitted members of the Northside Crips, and Garcia, who associates with the Northside Crips. Considering that (1) Gomez was an admitted

---

4. Appellant was required, over objection, to step down and publish tattoos on his arms to the jury. The objection to this evidence is discussed below.

5. Appellant indirectly seems to make the argument that he is entitled to a renunciation defense under Texas Penal Code § 15.04(a). However, the renunciation defense requires

an abandonment of the criminal conduct or further affirmative action that prevented the commission of the target crime. *See* TEX.PEN. CODE.ANN. 15.04(a) (Vernon Supp.2001). As set forth above, neither abandonment, nor the requisite affirmative preventative action are present in the instant case.

member of the Northside Crips, whose members are known to have engaged in violent activities, including murder, (2) that Appellant had known Gomez for several months, (3) that Appellant and Gomez shared common tattoos indicative of gang membership, (4) that Gomez actually suggested that the group kill the two boys, (5) that Appellant felt compelled to object to Gomez's suggestion, and (6) that following this suggestion, Carrier was left alone with three admitted members of Northside Crips and one person who associated with Northside Crips, we conclude that there is ample evidence on which the jury could have based its finding that Appellant should have anticipated Carrier's murder as a result of the carrying out of the conspiracy to commit robbery. Therefore, there is legally sufficient evidence to support the jury's finding that Appellant was guilty as a party to capital murder.

### FACTUAL SUFFICIENCY

■ In beginning the factual sufficiency review process, we assume that the evidence is legally sufficient under the *Jackson* standard. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App.1996). We then consider all of the evidence in the record related to Thompson's sufficiency challenge, not just the evidence which supports the verdict. *Id.* We review the evidence weighed by the jury which tends to prove the existence of the fact in dispute, and compare it to the evidence which tends to disprove that fact. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App. 1997). We may disagree with the jury's determination, even if probative evidence exists which supports the verdict. *See Clewis*, 922 S.W.2d at 133. However, our evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *See Santellan*, 939 S.W.2d at 164. We will reverse only when the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust. *See Clewis*, 922 S.W.2d at 134.

■ As set forth above, we have already concluded that the evidence is legally sufficient to support the jury's finding that the group engaged in a conspiracy to commit robbery, that Carrier's murder was committed in furtherance of the robbery, and that Appellant should have anticipated that the murder would occur. Our review of the record indicates that the only evidence offered that tends to contradict the jury's finding is Appellant's videotaped confession and grand jury testimony, in which Appellant denies any involvement in the plan to rob the two boys. We reiterate that the jury is the sole judge of the weight and credibility of witness testimony. *See Santellan*, 939 S.W.2d at 164. It follows that the jury was entitled to find that Garcia was a more credible witness than Appellant or that Garcia's version of the story was a more accurate account than the version of the story offered by Appellant. Our review of the record does not uncover any great weight of evidence contradicting the finding made by the jury in this case, nor does the jury's verdict otherwise shock the conscience of this Court. Therefore, we conclude that the evidence is factually sufficient to support the jury's finding that Appellant was guilty as a party to capital murder. Appellant's first issue is overruled.

### ADMISSIBILITY OF EVIDENCE

■ During trial, certain evidence was admitted over objection, of which Appellant now complains on appeal. First, evidence of Appellant's tattoos, which allegedly demonstrate gang affiliation were introduced. Second, testimony regarding Appellant's statement that he did not want Gomez to kill the boys because he

was already in trouble because of a pending charge for aggravated assault was introduced. We review the admissibility of this evidence under an abuse of discretion standard. *See Prystash v. State*, 3 S.W.3d 522, 527 (Tex.Crim.App.1999); *Caddell v. State*, 865 S.W.2d 489, 492 (Tex.App.—Tyler 1993, no pet.).

### a. *Tattoos*

■ We first consider the introduction of evidence related to Appellant's tattoos. At trial, Appellant objected that this evidence was not relevant, was more prejudicial than probative, and was indicative of inadmissible prior activity. *See* Tex. R.Evid . 401, 402, 403 and 404(b). The trial court found that the evidence tended to prove that Appellant knew or should have known of admitted gang member, Gomez's, violent propensity, a fact which tended to show that Appellant should have anticipated Carrier's murder as a result of carrying out the conspiracy to rob the two boys. Appellant apparently argues on appeal that the admission of this evidence was improper because it fails to demonstrate that Appellant was a member of a street gang. However, "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Tex.R.Evid. 401. It was not necessary that the tattoos show that Appellant was a member of a gang or even that he associated with a gang. The evidence was offered to show that Appellant had knowledge of gangs and gang members, which in turn, tended to show that Appellant had knowledge of the violent activities in which gangs, such as the Northside Crips, tend to engage, which in turn tended to demonstrate that Appellant should have anticipated Carrier's death in the course of carrying out the conspiracy,

with co-conspirator Gomez, to rob the two boys. Thus, we conclude that the evidence of Appellant's tattoos was relevant.

■ We next consider Appellant's objection that the unfairly prejudicial nature of the evidence outweighed its probative value. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex.R.Evid. 403. Appellant contends that by introducing his tattoos, in conjunction with testimony that such tattoos are symbolic of gang membership, the trial court allowed the jurors minds to become inflamed with the negative images commonly associated with gang membership. However, we note that the probative nature of Appellant's tattoos is great. As set forth above, Appellant's tattoos are highly probative as to Appellant's knowledge of Gomez's violent propensities, which demonstrates, in conjunction with other evidence, that Appellant should have anticipated Carrier's death in the course of the commission of the conspiracy. There was further evidence, however, that tattoos are not independently determinative of gang membership. Thus, the admission of Appellant's tattoos, which are only one indicator of gang membership, is not so prejudicial as to outweigh the probative value of the tattoos. Thus, we conclude that the trial court did not abuse its discretion in admitting this evidence. *See, e.g., Miller v. State*, 2 S.W.3d 475, 482 (Tex.App.—Tyler 1999, no writ).

Finally, we consider Appellant's objection regarding the tattoo evidence in light of Texas Rule of Evidence 404(b). Rule 404(b) states, "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Tex. R.Evid. 404(b). The rule further states, "It may, however, be admissible for other purposes, such as proof of . . . knowledge."

*Id.* As set forth above, evidence of Appellant's tattoos are relevant to show Appellant had knowledge of Gomez's violent propensities. Therefore, the trial court did not abuse its discretion in admitting the evidence.

### b. *Prior Criminal Activity*

■ Appellant argues that the trial court abused its discretion in admitting testimony that Appellant objected to Gomez's suggestion of murder because he was facing charges for aggravated assault and did not need any more trouble. Appellant first contends that this statement was improperly admitted over a hearsay objection pursuant to Texas Rule of Evidence 801(2)(E).[6] Rule 801(2)(E) states, "A statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." TEX.R.EVID. 801(2)(E). We have already concluded that there was sufficient evidence that Appellant was a member of the conspiracy to commit robbery. Appellant concedes in his brief that the statement was made in the course of such a conspiracy. However, Appellant argues that the statement was not made in furtherance of the conspiracy. We disagree. The record reflects that Appellant made this statement in response to Gomez's suggestion that they kill the two boys. The record further reflects that at the time, the group in Hinojosa's car was discussing the plan to rob the two boys. Discussion of the agreement that is the basis for the conspiracy is undoubtedly an act done in furtherance of the conspiracy. *See* TEX. PEN.CODE § 15.02(a). Appellant's debate with Gomez regarding Gomez's suggested addition of the crime of murder to the plan amounts to further discussion of the agreement that is the basis of the conspiracy. Therefore, Appellant's statement was made in furtherance of the conspiracy.

■ Appellant further argues that this statement was not relevant or that its relevance was outweighed by its prejudicial value. Additionally, Appellant argues that the evidence violated Texas Rule of Evidence 404(b), which, as set forth above, governs the admissibility of evidence concerning prior criminal activities.[7] We disagree. In the case at hand, Appellant's knowledge of Gomez's violent propensity is relevant to the issue of whether Appellant should have anticipated Carrier's death. Appellant's objection to Gomez's suggestion tended to show that Appellant had knowledge of Gomez's violent propensity, which is relevant to the issue of whether Appellant should have anticipated Carrier's death. Thus, Appellant's statement is relevant and further, was properly admitted under the "knowledge" exception for prior criminal activities. *See* TEX.R.EVID. 404(b).

■ We next address Appellant's contention that the admission the statement that Appellant was facing charges of aggravated assault violated Texas Rule of Evidence 403. As set forth above, this statement is highly probative as to the issue of whether Appellant had knowledge of Gomez's violent propensities, and thus, whether Appellant should have anticipated that Gomez would murder Carrier. Rule 403 "favors admissibility of relevant evidence, and the presumption is that rele-

---

**6.** The trial court limited the means by which the State could offer such evidence to Appellant's own statements made in furtherance of the conspiracy to commit robbery or Appellant's confession to police, rather than through extrinsic sources.

**7.** In accordance with Texas Rule of Evidence 404(b), the State supplied Appellant with notice of intent to use extraneous offenses.

vant evidence will be more probative than prejudicial." *See Miller*, 2 S.W.3d at 482, *citing Long v. State*, 823 S.W.2d 259, 271 (Tex.Crim.App.1991). The record reflects that the trial court properly limited the introduction of this evidence to Appellant's own statements made in furtherance of the conspiracy to commit robbery and that the trial court did not allow the evidence to be introduced through extrinsic sources. Therefore, we conclude that the trial court did not abuse its discretion in admitting this evidence. Appellant's second issue is overruled.

Accordingly, the judgment of the trial court is *affirmed.*