NO. 12-04-00067-CR
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
IVAN COULSTON,                                            §     APPEAL FROM THE 145TH
APPELLANT

V.                                                                         §     JUDICIAL DISTRICT COURT OF

THE STATE OF TEXAS,
APPELLEE                                                        §     NACOGDOCHES COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Ivan Coulston appeals his conviction for two counts of engaging in organized criminal
activity. Appellant raises two issues on appeal. We affirm.
 
Background
            On December 17, 2002, Rafael Hernandez, Dominga Gonzales, Louis Zarate, and others were
gathered for a cookout at the residence of Paul Gonzales in Nacogdoches, Texas. Some of the
attendees were members of the Southside 13 street gang. That day, Mateo Benitez, a member of the
rival Latin Kings street gang, had upset members of the group when he arrived at the residence and
attempted to start a fight with Zarate. During the exchange between Benitez and Zarate, Hernandez
broke the rear window of Benitez’s vehicle with a rock. Benitez drove away making threats of
vengeance.
            Later that night, Hernandez and Dominga were sitting and talking on the tailgate of a truck. 
Suddenly, multiple shots rang out. The shots originated from a nearby small wooded hill. Dominga
was struck in the back by one of the shots, and Hernandez was struck in the foot by another. 
Dominga suffered internal injuries, including a collapsed lung. She underwent surgery and survived. 
Hernandez, although injured, also survived.
            Appellant was charged with two counts of engaging in organized criminal activity. The
matter proceeded to trial by jury.
            Nacogdoches Police Officer Robert Mobley, who testified on behalf of the State, stated that
he was on patrol that night. Mobley testified that he was attempting to observe what he thought were
people near the hill when shots were fired. Mobley drove to a parking lot near the hill where he
found Thomas Gonzales waiting in a van. He then observed two or three suspects running from the
woods toward the van. Mobley identified the clothing worn by one of these individuals as a light-colored muscle shirt, black wind pants with a white stripe down the side, and white gloves. Mobley
testified that the area was wet and muddy at that time. Mobley further testified that he discovered
a cell phone and a BellSouth two-way radio inside the van.
            Nacogdoches Police Officer Jeff Luman discovered Appellant at a house on Fredonia Street
following the shooting. Luman testified that Appellant was crouched down inside a red Jeep
Cherokee behind the house. Once Appellant was out of the vehicle, Luman observed that Appellant
was sweating profusely and out of breath as if he had been running. Luman further stated that
Appellant had scratches on his arms and “stick-tites” all over his clothing as if he had been running
through the woods. Luman further stated that Appellant was wearing a gray sleeveless muscle shirt,
tennis shoes, and a pair of black sweat pants with a white stripe down the side. Luman testified that
Appellant had mud on his pant knees and shoes. Appellant was taken into custody and Luman, with
consent, searched Appellant’s vehicle. In Appellant’s vehicle, Luman discovered a pair of white
cloth gloves with dirt on the palms, a set of binoculars, a black ski mask with grass and dirt on it,
and a cell phone located on the passenger seat of the Jeep. Detective Jerry Stone of the Nacogdoches
Police Department later testified that he inventoried the Jeep and located, in addition to the items
discovered by Luman, a Motorola walkie-talkie.
            Thomas Gonzales, a previously-convicted co-defendant for the offense in question, testified
that Appellant was directly involved in the December 17 shooting. Thomas Gonzales, who admitted
he was a member of the Latin Kings, testified that both Appellant and Benitez were also members
of the Latin Kings. Thomas Gonzales stated that Benitez had some problems with Paul Gonzales
earlier on the day of the shooting. Thomas Gonzales testified that he, Appellant, Benitez, and
“Chino” met at Appellant’s house, moved on to Benitez’s house, where Appellant left his Jeep, and
then left for Paul Gonzales’s home in the van with the plan of firing on Paul Gonzales’s house. 
Thomas Gonzales specified that Appellant carried an SKS assault rifle, which Appellant later told
Thomas Gonzales he had thrown in the water at the “shooting place.” Thomas Gonzales stated that
the SKS discovered at the scene resembled the one Appellant had with him that night. Thomas
Gonzales further stated that the walkie-talkie in his van was one of two, which were specifically to
be used to communicate during the shooting. 
            Nacogdoches Police Department Detective Bob Killingsworth testified as a criminal street
gang expert. Killingsworth stated that in 2002, Appellant was the actual and self-identified leader
of the Latin Kings. Appellant stipulated to being a member of the Latin Kings. Killingsworth
further testified that “nothing happens within the Latin King organization without leadership’s
knowledge and approval. . . .”
            Thomas White, a forensic chemist with the Department of Public Safety Crime Laboratory,
testified regarding two casts he made of shoe prints found on the hill from which the shots were
fired. White compared the casts to an impression of the right shoe Appellant was wearing when he
was arrested. White testified that the size and tread pattern of the shoe are similar to the size and
tread pattern exhibited in the prints depicted in the two casts. Based on that fact, White testified that
Appellant’s shoe could have made the shoe print. However, from such evidence, White stated that
he could not determine that it was the very same shoe Appellant was wearing that made the shoe
print.
            Appellant testified that after working in his yard that afternoon, he had gone to the home of
a friend, Ovideo Castro, that evening to listen to music and drink beer. Appellant stated that he left
Castro’s house at about 11:30 p.m. and was on his way home when he saw police activity in the area. 
According to Appellant, fearing that he would be pulled over for DWI, he drove to Benitez’s former
house and sat in his car to “let some of [the] alcohol come down.” Castro also testified that
Appellant had been at his house that night, but that Appellant had left sometime after 11:00 p.m.
            The jury ultimately found Appellant guilty as charged. The trial court sentenced Appellant
to imprisonment for thirty years on the first count, which related to Dominga Gonzales, and fifteen
years on the second count, which related to Hernandez. The trial court ordered that sentences run
concurrently. This appeal followed.
 
Accomplice Testimony
            In conjunction with his first and second issues, which are discussed below, Appellant argues
that Thomas Gonzales’s testimony is not sufficiently corroborated. Texas Code of Criminal
Procedure article 38.14 states that “[a] conviction cannot be had upon the testimony of an accomplice
unless corroborated by other evidence tending to connect the defendant with the offense committed;
and the corroboration is not sufficient if it merely shows the commission of the offense.” Tex. Code
Crim. Proc. Ann. art. 38.14 (Vernon 2005). In order to determine whether accomplice witness
testimony is corroborated, we must eliminate all accomplice evidence and determine whether the
other inculpatory facts and circumstances in evidence tend to connect the appellant to the offense. 
See McDuff v. State, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997); Thompson v. State, 54 S.W.3d
88, 93 (Tex. App.–Tyler 2001, pet. ref’d). The non-accomplice evidence does not have to directly
link the appellant to the crime, nor does it alone have to establish his guilt beyond a reasonable
doubt; but rather, the non-accomplice evidence merely has to tend to connect the appellant to the
offense. See McDuff, 939 S.W.2d at 613. While the accused’s mere presence in the company of
the accomplice before, during, and after the commission of the offense is insufficient by itself to
corroborate accomplice testimony, evidence of such presence, coupled with other suspicious
circumstances, may tend to connect the accused to the offense. Dowthitt v. State, 931 S.W.2d 244,
249 (Tex. Crim. App. 1996); Thompson, 54 S.W.3d at 93–94.
            In the case at hand, the evidence, other than Thomas Gonzales’s testimony, that tended to
connect Appellant to the offense is as follows:
 
              1.           Appellant stipulated to being a member of the Latin Kings street gang. 
Killingsworth testified that, in 2002, Appellant was the actual and self-identified
leader of the Latin Kings. Killingsworth further testified that “nothing happens
within the Latin King organization without leadership’s knowledge and approval....”
 
              2.           Mobley testified that he discovered Thomas Gonzales waiting in a van in a parking
lot adjacent to the wooded area where the shots originated and observed two or
three suspects running from the woods toward the van. Mobley identified the
clothing worn by one of these individuals as a light-colored muscle shirt, black wind
pants with a white stripe down the side, and white gloves. Mobley testified that the
area was wet and muddy at that time. Mobley further testified that he discovered
a cell phone and a BellSouth two-way radio inside the van.
 
              3.           Luman, who discovered Appellant at a house on Fredonia Street formerly occupied
by Benitez, testified that Appellant was crouched down inside a red Jeep Cherokee
behind the house. Once Appellant was out of the vehicle, Luman observed that
Appellant was sweating profusely and out of breath as if he had been running. 
Luman further observed that Appellant had scratches on his arms and “stick-tites”
all over his clothing as if he had been running through the woods. Luman stated
that Appellant was wearing a gray sleeveless muscle shirt, tennis shoes, and a pair
of black sweat pants with a white stripe down the side. Luman further testified that
Appellant had mud on his pant knees and shoes. Luman searched Appellant’s
vehicle and discovered a pair of white cloth gloves with dirt on the palms, a set of
binoculars, a black ski mask with grass and dirt on it, and a cell phone located on
the passenger seat of the Jeep. Stone, who inventoried the Jeep, located, in addition
to the items discovered by Luman, a Motorola walkie-talkie.
 
              4.           White, who compared the footprint discovered in the wooded area from which the
shots originated with a shoe Appellant was wearing at the time of his arrest, testified
that the size and tread pattern of Appellant’s shoe are similar to the size and tread
pattern exhibited in the prints depicted in the two casts taken from the scene. Based
on that fact, White testified that Appellant’s shoe could have made the shoe print
at the scene.
 
            We conclude that after eliminating Thomas Gonzales’s testimony, the other inculpatory facts
and circumstances in evidence tend to connect Appellant to the offenses with which he is charged. 
Therefore, we hold that Thomas Gonzales’s testimony is sufficiently corroborated.
 
Evidentiary Sufficiency
            In his first and second issues, Appellant contends that the evidence is insufficient to support
the jury’s verdict.



Legal Sufficiency
            Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction. See Jackson v. Virginia, 443 U.S. 307,
315-16, 99 S. Ct. 2781, 2786-87, 61 L. Ed. 2d 560 (1979); see also Escobedo v. State, 6 S.W.3d 1,
6 (Tex. App.–San Antonio 1999, no pet.). The standard for reviewing a legal sufficiency challenge
is whether any rational trier of fact could have found the essential elements of the offense beyond
a reasonable doubt. See Jackson, 443 U.S. at 320, 99 S. Ct. at 2789; see also Johnson v. State, 871
S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to
the jury’s verdict. See Jackson, 443 U.S. at 320, 99 S. Ct. at 2789; Johnson, 871 S.W.2d at 186. 
A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing
court. See Tibbs v. Florida, 457 U.S. 31, 41-42, 102 S. Ct. 2211, 2217-18, 72 L. Ed. 2d 652 (1982).
            The sufficiency of the evidence is measured against the offense as defined by a hypothetically
correct jury charge. See Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a
charge would include one that “accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State’s burden of proof or unnecessarily restrict the State’s theories of
liability, and adequately describes the particular offense for which the defendant is tried.” Id. 
            A person commits the offense of engaging in organized criminal activity if he, as a member
of a criminal street gang, commits or conspires to commit, among other things, the crime of
aggravated assault.


 See Tex. Pen. Code Ann. § 71.02 (Vernon Supp. 2004–05). “Criminal street
gang” means three or more persons having a common identifying sign or symbol or an identifiable
leadership, who continuously or regularly associate in the commission of criminal activities. Tex.
Pen. Code Ann. § 71.01(d) (Vernon 2003).
            A person commits aggravated assault when he intentionally, knowingly, or recklessly causes 
bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault. 
See Tex. Pen. Code Ann. §§ 22.01(a)(1), 22.02(a)(2) (Vernon Supp. 2004–05).


 A “deadly
weapon” includes a firearm. See Tex. Pen. Code Ann. § 1.07(a)(17)(a) (Vernon Supp. 2004–05).
            A person is criminally responsible as a party to an offense if the offense is committed by the
conduct of another for which he is “criminally responsible.” See Tex. Pen. Code Ann. § 7.01(a)
(Vernon 2003). A person is “criminally responsible” for an offense committed by the conduct of
another if, acting with the intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the offense. See Tex. Pen.
Code Ann. § 7.02(a)(2) (Vernon 2003). 
            In the case at hand, Thomas Gonzales, who admitted he was a member of the Latin Kings,
testified that both Appellant and Benitez were also members of the Latin Kings. Appellant stipulated
to his membership in the Latin Kings. Killingsworth, a criminal street gang expert testified that in
2002, Appellant was the actual and self-identified leader of the Latin Kings, a street gang with
between thirty to thirty-five members in Nacogdoches in 2002. Killingsworth also stated that
nothing happens in the Latin Kings organization without the knowledge and approval of leadership. 
Killingsworth further testified that the Latin Kings are a nationwide organization in twenty-eight
different states and have headquarters in Gary, Indiana. Killingsworth stated that the Latin Kings
have identifying marks, such as a crown tattoo, pointed-up pitchfork, shaved heads, black and gold
colors, and ball caps tilted to the left. Killingsworth further stated that the Latin Kings make hand
signs in the form of either a crown or an “L.K.” Killingsworth also testified that the Latin Kings
regularly committed criminal offenses in 2002.
            Thomas Gonzales testified that Appellant was directly involved in the December 17 shooting
and that Appellant, Benitez, and Chino had planned the shooting at Paul Gonzales’s house. Thomas
Gonzales stated that he, Appellant, Benitez, and Chino met at Appellant’s house, moved on to
Benitez’s house, where Appellant left his Jeep, and then left for Paul Gonzales’s home in a van with
the plan of firing on the Paul Gonzales’s house. Thomas Gonzales specified that Appellant had an
SKS assault rifle, which Appellant later told Thomas Gonzales he had thrown in the water at the
“shooting place.” Thomas Gonzales stated that the SKS discovered at the scene resembled the one
Appellant carried that night. Thomas Gonzales also testified that Benitez had both a .45 and a .380
caliber handgun that night while Chino was carrying a nine millimeter. Thomas Gonzales further
stated that the walkie-talkie in his van was one of two and was specifically to be used to
communicate during the shooting. Stone, who inventoried the Jeep in which Appellant was
discovered, located a Motorola walkie-talkie. 
            Mobley testified that he heard gunshots and saw muzzle blasts from two different locations
on the hill near the parking lot where he later discovered Thomas Gonzales waiting in a van. 
Hernandez testified that he saw muzzle flashes, which he referred to as sparkles, from two or three
guns on the hill. Both Hernandez and Dominga Gonzales testified that they were struck by bullets
after the shots were fired from the hill.
            Doctor James Redfield, Jr., who treated Dominga Gonzales and Hernandez at the hospital
that night, testified that Dominga Gonzales suffered internal bleeding and a collapsed lung as a result
of a gunshot wound. Redfield stated that without treatment, Dominga Gonzales would not have
survived her injuries. Hernandez testified that he was shot in the foot, was treated at the hospital,
and was later released. Redfield testified that an x-ray of Hernandez’s foot showed the bullet to be
partially lodged in his heel. Hernandez stated that he still suffers occasional pain related to the
injury.
            Mobley testified that immediately following the shooting, he observed two or three suspects
running from the woods toward the van in which he had just discovered Thomas Gonzales. Mobley
identified the clothing worn by one of these individuals as a light-colored muscle shirt, black wind
pants with a white stripe down the side, and white gloves. Mobley testified that the area was wet and
muddy at that time. Mobley further testified that he discovered a cell phone and a BellSouth two-way radio inside the van.
            Luman, who discovered Appellant at a house on Fredonia Street formerly occupied by
Benitez, testified that Appellant was crouched down inside a red Jeep Cherokee behind the house. 
Luman observed that Appellant was sweating profusely and out of breath as if he had been running. 
Luman further observed that Appellant had scratches on his arms and “stick-tites” all over his
clothing as if he had been running through the woods. Luman stated that Appellant was wearing a
gray sleeveless muscle shirt, tennis shoes, and a pair of black sweat pants with a white stripe down
the side. Luman further testified that Appellant had mud on his pant knees and shoes. Luman
searched Appellant’s vehicle and discovered a pair of white cloth gloves with dirt on the palms, a
set of binoculars, a black ski mask with grass and dirt on it, and a cell phone located on the passenger
seat of the Jeep.
            White, who compared the footprint discovered in the wooded area from which the shots
originated, testified that the size and tread pattern of the shoe Appellant was wearing at the time of
his arrest is similar to the size and tread pattern exhibited in the prints depicted in the two casts taken
from the scene. Based on that fact, White testified that Appellant’s shoe could have made the shoe
print found at the scene.
            Examining the evidence in the light most favorable to the jury’s verdict, we conclude that
the jury could have reasonably determined beyond a reasonable doubt that Appellant, as a leader of
the Latin Kings criminal street gang, promoted or assisted fellow gang members, Benitez and Chino,
by directing, aiding, or attempting to aid them to commit aggravated assaults against Dominga
Gonzales and Hernandez by intentionally, knowingly, or recklessly shooting them with firearms. 
Therefore, we hold that the evidence was legally sufficient to support the jury’s verdict. Appellant’s
first issue is overruled.
Factual Sufficiency
            Turning to Appellant’s contention that the evidence is not factually sufficient to support the
jury’s verdict, we must first assume that the evidence is legally sufficient under the Jackson
standard. See Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We then consider all
of the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute
and compare it to the evidence that tends to disprove that fact. See Santellan v. State, 939 S.W.2d
155, 164 (Tex. Crim. App. 1997). Although we are authorized to disagree with the jury’s
determination, even if probative evidence exists that supports the verdict, see Clewis, 922 S.W.2d
at 133, our evaluation should not substantially intrude upon the jury’s role as the sole judge of the
weight and credibility of witness testimony. Santellan, 939 S.W.2d at 164. Where there is
conflicting evidence, the jury’s verdict on such matters is generally regarded as conclusive. See Van
Zandt v. State, 932 S.W.2d 88, 96 (Tex. App.–El Paso 1996, pet. ref’d). Ultimately, we must ask
whether a neutral review of all the evidence, both for and against the finding, demonstrates that the
proof of guilt is so obviously weak as to undermine our confidence in the jury's determination, or the
proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).


 
            A verdict will be set aside “only if the evidence supporting guilt is so obviously weak, or the
contrary evidence so overwhelmingly outweighs the supporting evidence, as to render the conviction
clearly wrong and manifestly unjust.” Ortiz v. State, 93 S.W.3d 79, 87 (Tex. Crim. App. 2002); see 
 Sims v. State, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003). A clearly wrong and manifestly unjust
verdict occurs where the jury's finding “shocks the conscience” or “clearly demonstrates bias.” 
Zuniga, 144 S.W.3d at 481.
            As the court of criminal appeals explained in Zuniga, "There is only one question to be
answered in a factual-sufficiency review: Considering all of the evidence in a neutral light, was a
jury rationally justified in its finding of guilt beyond a reasonable doubt?” See id. at 484. 
            In the case at hand, in addition to the evidence already discussed, Appellant testified that after
working in his yard that afternoon, he had gone to Castro’s house that evening to listen to music and
drink beer. Appellant stated that he left Castro’s house at about 11:30 p.m. and was on his way
home when he saw police activity in the area. According to Appellant, fearing that he would be
pulled over for DWI, he drove to Benitez’s former house and sat in his car to “let some of [the]
alcohol come down.” Castro also testified that Appellant had been at his house that night, but that
Appellant had left sometime after 11:00 p.m.
            We have reviewed the record in its entirety. We iterate that our evaluation should not
substantially intrude upon the jury’s role as the sole judge of the weight and credibility of witness
testimony, see Santellan, 939 S.W.2d at 164, and where there is conflicting evidence, the jury’s
verdict on such matters is generally regarded as conclusive. See Van Zandt, 932 S.W.2d at 96. It
follows that the jury was entitled to find that Appellant and Castro were less credible than the
witnesses who testified on the State’s behalf and that the facts they related concerning Appellant’s
whereabouts on the night in question were not an accurate portrayal of the events that had, in fact,
transpired. See, e.g., Thompson, 54 S.W.3d at 97. Our review of the record as a whole, with
consideration given to all of the evidence, both for and against the trial court’s finding, has not
revealed to us any evidence that causes us to conclude that the proof of guilt is so obviously weak
or is otherwise so greatly outweighed by contrary proof as to render Appellant’s conviction clearly
wrong or manifestly unjust. Therefore, we hold that the evidence is factually sufficient to support
the jury’s verdict. Appellant’s second issue is overruled.
 
Disposition
Having overruled Appellant’s issues one and two, we affirm the trial court’s judgment.
 
 
 
                                                                                                    DIANE DEVASTO 
                                                                                                                 Justice
 
 
Opinion delivered June 15, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.


















(DO NOT PUBLISH)