Opinion issued April 10, 2008









     




In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00174-CR




ANNE ELIZABETH MURPHY, Appellant

v.

THE STATE OF TEXAS, Appellee




On Appeal from the 177th District Court
Harris County, Texas
Trial Court Cause No. 1103474




MEMORANDUM OPINION

          A jury convicted appellant, Anne Elizabeth Murphy, of capital murder. See
Tex. Pen. Code Ann. § 19.03(a)(7)(A) (Vernon Supp. 2007). The State did not seek
the death penalty, and the trial court sentenced appellant to life in prison, as
statutorily required. See Tex. Pen. Code Ann § 12.31(a) (Vernon Supp. 2007). In
seven issues, appellant contends that (1) insufficient evidence was presented to
corroborate the testimony of an accomplice witness; (2) the evidence was legally and
factually insufficient to support her conviction; (3) she was deprived of her federal
and state constitutional right “to the effective assistance of counsel and due process
of law”; (4) the trial court abused its discretion “by not allowing trial counsel to
inform the jury that appellant would be sentenced to life without parole if found
guilty of capital murder”; and (5) the trial court erred by denying appellant’s request
that the jury be instructed on the lesser-included offense of negligent homicide.
          We affirm.
Background
          On September 5, 2005, appellant felt depressed because of her drug habit. To
cheer her up, appellant and her friend, Kristi Lang, decided to go out to a bar. On the
way, appellant and Lang stopped at the home of appellant’s friend, Clifford Aulds. 
Without the knowledge or consent of Aulds, appellant took one of Aulds’s guns,
described at trial as “a long barreled Iver Johnson” .22 caliber revolver (“the Iver
Johnson revolver”).
          Appellant told Lang that she wanted the gun for protection. With the Iver
Johnson revolver under the driver’s seat, appellant drove to a bar and then to another
bar. When they arrived at the second bar, appellant put the gun in Lang’s purse and
carried the purse and the gun inside the bar. While Lang danced and played pool,
appellant sat at the bar, drinking beer, talking to the bartender, and holding the purse
tightly. The women left the bar at around midnight.
          At the same time that appellant and Lang were leaving the bar, the
complainant, Gustavo Flores, and his three friends were arriving in a truck. Lang saw
Flores and said “Hola” to him, nothing more. Lang then got into the passenger seat
of appellant’s car. Appellant stayed outside the car and spoke to Flores in the parking
lot. 
          When she got back in the car, appellant took the the Iver Johnson revolver out
of Lang’s purse and put it under the driver’s seat. As they were pulling out of the
parking lot, appellant told Lang that the men wanted to have sex for money. Such a
proposal shocked Lang. Lang did not agree to have sex in exchange for money with
Flores and his friends. In contrast, appellant did not seem upset by the proposal. 
          Meanwhile, Flores got into his truck and told his friends that appellant had
agreed to have sex with him for money. Flores also told his friends that appellant had
told him to follow her. Flores’s friends thought this was a bad idea, but agreed to
accompany him. 
          As the women were driving, Lang noticed that the Flores’s truck was following
them. When Lang mentioned this, appellant did not seem alarmed and continued
driving toward Lang’s home. Before reaching Lang’s house, appellant turned off into
a neighborhood and pulled into the driveway of a vacant house. Appellant was
familiar with the house because she knew the owners and had been interested in
purchasing the home. The house had no electricity and the area surrounding the
house was very dark.
          As appellant and Lang pulled into the vacant house’s driveway, Flores’s truck
pulled in and stopped next to appellant’s car. Appellant got out of the car and
approached Flores as he sat in his truck. She asked Flores to get out of the truck and
go inside the house. Flores took money out of his wallet and put it in his pants
pocket. Flores left his wallet in the truck, but did not leave the keys to the truck. 
Flores told his friends that he planned to have sex with appellant in the house.           Flores followed appellant toward the house and into an area that was extremely
dark underneath the carport. Less than one minute after Flores followed appellant
toward the house, a gunshot was heard. One of Flores’s friends saw a flash when the
gun fired; however, he did not hear any cries for help or arguing before the shot. A
bullet struck Flores in the side of the head resulting in his death.
          Appellant than approached the three other man in the truck and pointed the gun
at them. She stated that if the men did not give her their wallets, she would kill them. 
The men complied and gave appellant their wallets. 
          While these events were taking place, Lang had gotten out of the car and had
run behind the vacant house. She did so because she had to urinate and because she
was frightened. Once behind the house, Lang realized that she could not get out of
the back yard. As she was coming back around the side of the house, Lang heard a
gunshot. She then saw the silhouette of a man’s body lying on the ground with
appellant standing near it. Lang got into the car and yelled for appellant to get in the
vehicle. Lang saw appellant approach the truck before appellant returned to the car. 
When appellant got back int the car, Lang saw that she had the gun, wallets, money,
and keys. 
          As they drove away from the scene, appellant seemed angry, not scared. 
Appellant told Lang that the men did not have any money and that they were “going
to rape us.” Appellant then stated that she wished that she had shot all of the men. 
          Lang did not call the police because she feared that appellant would shoot her.
The next day, appellant came to Lang’s home to talk to her. She told Lang not to
speak to anyone about the incident, including the police. Appellant also showed Lang
a bruise on her shoulder and again told Lang that the men had planned to rape them. 
Appellant also told Lang that she had been in a car accident only a few days before
the incident. Lang believed that the bruise on appellant’s shoulder was caused by the
seatbelt during the accident, not by Flores. 
          After the shooting, appellant returned the gun to Auld’s home. The day
following the shooting, appellant left her car at an acquaintance’s home, left her
residence, and checked into a motel. 
          From the scene, the police recovered a receipt for a money gram bearing Lang’s
name and address. The police contacted Lang and obtained a voluntary statement
from her. 
          Through their investigation, the police developed appellant as a suspect. The 
investigating officers contacted appellant’s boyfriend, who assisted the police in
calling appellant at the motel where she was staying and in convincing appellant to
surrender to the police. 
          Appellant gave a statement to the police in which she admitted to being at the
scene and to holding the gun when Flores was shot. She identified the weapon that
shot Flores as the Iver Johnson revolver. Appellant claimed that she had intended
only to scare Flores with the gun but that it had gone off accidently when she
removed it from Lang’s purse. 
          With this information, the police recovered the Iver Johnson revolver from
Aulds’s home. The police also recovered appellant’s car, which matched the vehicle
description given by Flores’s friends. In addition, two of Flores’s friends positively
identified appellant in a photographic lineup as the person who took their wallets at
gunpoint and who they saw talking to Flores at the scene before he was shot.
          Appellant was charged with and convicted of the capital murder of Flores. 
Accomplice-Witness Rule
          At trial, Lang testified for the State. The trial court instructed the jurors to
determine whether Lang was an accomplice as a matter of fact. In her first issue,
appellant asserts, “Assuming arguendo that Kristi Lang was an accomplice witness
as a matter of fact, there is not sufficient evidence to corroborate her accomplice
testimony.” We disagree.
          A conviction cannot be based on the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the offense
committed; and the corroboration is not sufficient if it merely shows the commission
of the offense. Castillo v. State, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). 
Under this rule, the reviewing court eliminates all of the accomplice testimony from
consideration and then examines the remaining portions of the record to determine
if there is any evidence that tends to connect the accused with the commission of the
crime. Id. (citing Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). 
The corroborating evidence need not be sufficient by itself to establish guilt; there
simply needs to be “other” evidence “tending to connect” the defendant to the
offense. Id. The Court of Criminal Appeals has noted that “unlike extrajudicial
confessions, testimony of an accomplice need be corroborated only as to facts
‘tending to connect the defendant with the offense committed’ and not as to the
corpus delicti itself.” Id. (quoting Gribble v. State, 808 S.W.2d 65, 71 n.13 (Tex.
Crim. App. 1990)). “The non-accomplice evidence does not have to directly link [the
defendant] to the crime, nor does it alone have to establish his guilt beyond a
reasonable doubt.” Id. (quoting McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim.
App. 1997)). There must simply be some non-accomplice evidence that tends to
connect the defendant to the commission of the offense alleged in the indictment. Id.
          Here, assuming that the jury found Lang to be an accomplice, the record
contains ample evidence other than Lang’s testimony that tends to connect appellant
to the offense of capital murder. Appellant testified at trial that she was holding the
gun when it fired and fatally shot appellant. In her statement to police, appellant had
exclaimed that her “life was ruined” and that she had “murdered a man.” Even
though appellant claimed that the gun fired accidently and that she brandished the
weapon in self-defense, appellant’s testimony and extra-judicial statement were
sufficient to tend to connect appellant with the commission of the offense. See
Romero v. State, 716 S.W.2d 519, 523 (Tex. Crim. App. 1986) (holding extra-judicial
confession sufficient to corroborate accomplice testimony); Jackson v. State, 516
S.W.2d 167, 171 (Tex. Crim. App. 1974) (holding judicial confession sufficient to
corroborate accomplice testimony despite defendant’s testimony he acted in
self-defense); see also Thompson v. State, 54 S.W.3d 88, 94 (Tex. App.—Tyler 2001,
pet. ref’d) (involving defendant’s extra-judicial confession which corroborated
accomplice’s testimony).
          In addition, other non-accomplice testimony tends to connect appellant to the
offense. One of Flores’s friends, Rafael Hernandez, testified that appellant entered
into an agreement with Flores to have sex with Flores for money. According to
Hernandez, appellant directed Flores to follow her in her car. Once at the vacant
house, appellant then directed Flores to get out of his truck and follow her to the
house. Flores followed appellant to a very dark area under the carport where he was
shot in the head less than one minute later. The evidence at trial also showed that,
following the shooting, appellant left her car at an acquaintance’s residence and went
to stay at a motel. Taken together, we hold that there was sufficient non-accomplice
evidence that tended to connect appellant to the offense. See Hernandez v. State, 939
S.W.2d 173, 178 (Tex. Crim. App. 1997). 
          We overrule appellant’s first issue.
Legal and Factual Sufficiency
          In her second and third issues, appellant contends that, even if the jury properly
considered Lang’s testimony, the evidence was nonetheless legally and factually
insufficient to support her conviction for capital murder.
A.      Standards of Review
          A legal sufficiency challenge requires us to determine whether, after viewing
the evidence in the light most favorable to the verdict, any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Johnson
v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Parker v. State, 192 S.W.3d 801,
804 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d). Although our analysis
considers all of the evidence presented at trial, we may not re-weigh the evidence and
substitute our judgment for that of the fact-finder. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000).
          When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. See Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We
will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson, 23 S.W.3d at 11. Under the first prong of
Johnson, we cannot conclude that a conviction is “clearly wrong” or “manifestly
unjust” simply because, on the quantum of evidence admitted, we would have voted
to acquit had we been on the jury. Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim.
App. 2006).
          Under the second prong of Johnson, we cannot declare that a conflict in the
evidence justifies a new trial simply because we disagree with the jury’s resolution
of that conflict. Id. Before finding that evidence is factually insufficient to support
a verdict under the second prong of Johnson, we must be able to say, with some
objective basis in the record, that the great weight and preponderance of the evidence
contradicts the jury’s verdict. Id.
          In conducting a factual-sufficiency review, we must discuss the evidence that,
according to the appellant, most undermines the jury’s verdict. See Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).
B.      The Law Governing the Offense
          A person commits capital murder if she commits murder as defined under
section 19.02(b)(1) and, inter alia, the person intentionally commits the murder in the
course of committing or attempting to commit robbery. Tex. Pen. Code Ann.
§ 19.03(a)(2) (Vernon Supp. 2007). A person commits murder if she “intentionally
or knowingly causes the death of an individual.” Id. § 19.02(b)(1) (Vernon 2003). 
A person commits robbery if, in the course of committing theft, as defined in Chapter
31, and with intent to obtain or maintain control of property, she intentionally,
knowingly, or recklessly causes bodily injury to another, or intentionally or
knowingly places another in fear of imminent bodily injury or death. Id. § 29.02(a). 
Theft is the unlawful appropriation of property with the intent to deprive the owner
of the property. Tex. Pen. Code Ann. § 31.03 (Vernon Supp. 2007). A person acts
intentionally with respect to a result of her conduct when it is her conscious objective
or desire to engage in the conduct or to cause the result. Tex. Pen. Code Ann.
§ 6.03(a) (Vernon 2003). 
C.      Legal Sufficiency Analysis
          In her second issue, appellant contends that the evidence is legally insufficient
to support her conviction because the State failed to prove either that (1) she
intentionally killed Flores or that (2) she killed Flores in the course of committing a
robbery.
          1.       Intent to Kill Flores
          A jury may infer an intent to kill from an accused’s use of a deadly weapon.
See Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). A firearm is a
deadly weapon per se under the Penal Code. See Tex. Pen. Code Ann.
§ 1.07(a)(17)(A) (Vernon Supp. 2007). In addition, a jury may infer the requisite
intent from any facts which tend to prove its existence, including the acts, words, and
conduct of the accused, the method of committing the crime, and the nature of the
wounds inflicted on the victims. Hart v. State, 89 S.W.3d 61, 64 (Tex. Crim. App.
2002). 
          Here, by its verdict, the jury rejected appellant’s testimony that the Iver
Johnson revolver accidently discharged when she took it out of the purse. The
medical examiner’s testimony placed the Iver Johnson revolver within six inches of
Flores’s head when he was shot. The law presumes an intent to kill when a deadly
weapon is fired at close range and death results. Womble v. State, 618 S.W.2d 59, 64
(Tex. Crim. App. 1981). 
          The State’s ballistics expert testified that the Iver Johnson revolver could be
fired in a double-action mode (i.e., the hammer is not cocked but pulling the trigger
causes the hammer to go back and then fall forward) or in a single-action mode (i.e., 
the hammer is cocked and pulling the trigger causes the hammer to fall forward). The
ballistics expert testified that it took only three pounds of pressure to pull the trigger
for the single-action mode (hammer already cocked), but required twelve pounds of
pressure to pull the trigger for the double-action mode. The ballistics expert also
testified that in the single-action mode, when the hammer was cocked, testing of the
the Iver Johnson revolver showed that it would, at times, discharge when the weapon
was jostled slightly. 
          Appellant testified that she did not know whether she had cocked the hammer
on the weapon before she put it in Lang’s purse. Thus, when the gun discharged,
killing Flores, appellant either had already cocked the weapon or had to exert twelve
pounds of pressure to pull the trigger. Either scenario is evidence from which the jury
could infer an intent to kill.
          The State also presented the following evidence which supported a reasonable
inference by the jury that appellant intended to kill Flores: 
          •        When appellant and Flores walked back to the darkened area near the
vacant house, appellant did not appear fearful of Flores; instead, she
invited him to follow her for the purpose of having sex.
 
          •        When appellant and Flores went back to the darkened area, appellant
was carrying the Iver Johnson revolver in the purse.
 
          •        Once appellant and Flores reached the darkened area, and before Flores
was shot, Flores’s friend, Rafeal Hernandez, did not hear any sound
indicating a struggle or cries for help from appellant.
 
          •        Appellant admitted that she was holding the Iver Johnson revolver when
it discharged.
 
          •        Immediately after shooting Flores, appellant walked over to the truck
and threatened to kill Flores’s friends if they did not give her their
wallets.
 
          •        Appellant told Lang that she wished that she had killed all of the men.
 
          •        Appellant did not call the authorities to help Flores.          
          •        Appellant told police in her statement that she had murdered a man. 
          Viewing the evidence in the light most favorable to the verdict, we conclude
that a rational trier of fact could have found beyond a reasonable doubt that appellant
formed the intent to kill Flores. See Johnson, 23 S.W.3d at 7. 
          2.       Murder in Course of Committing, or Attempting to Commit, Robbery
          Appellant claims that the State did not prove that she murdered Flores in the
course of committing a robbery. Appellant points to evidence that she contends
shows that she did not actually rob Flores. The State correctly points out that it was
not required to prove that appellant actually robbed Flores; rather, the State was
required only to show that appellant murdered Flores while attempting to rob him. 
See Tex. Pen. Code Ann. § 19.03(a)(2). 
          More specifically, for the murder in this case to qualify as a capital murder,
appellant had to form the intent to rob Flores before or at the time of the murder. See
Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). To this end, the
State had the burden to proffer evidence from which a rational jury could conclude
beyond a reasonable doubt that appellant formed the requisite intent to rob before or
during the commission of the murder. See id. The jury was permitted to infer the
requisite intent from the acts, words, and conduct of appellant. See id. 
          The following evidence supports a reasonable inference by the jury that
appellant formed the intent to rob Flores before or during her commission of Flores’s
murder:
          •        Appellant told Flores that she would have sex with him for money and 
directed appellant to follow her to a house, which she knew was vacant
and dark.
 
          •        Before Flores got out of the truck, he took cash from his wallet and put
it in his pocket.
 
          •        Once at the vacant house, appellant instructed Flores to follow her into
the house. Appellant led Flores to a very dark area under the carport
where appellant was shot and killed.
 
          •        Appellant immediately walked over to the three men in the truck and
robbed them.
 
          •        When she got into the car with Lang, appellant appeared angry and told
Lang that the men did not have any money.
 
          •        When appellant returned to the car, Lang saw that appellant had not only
two wallets and the gun, but also loose cash.
 
          •        The forensic evidence showed that Flores had abrasions on his face
indicating that, when he was shot, he fell face down. However, when
his body was found, Flores was lying on his back with his right leg
crossed over his left leg. Based on this information, the medical
examiner testified that, in her opinion, Flores was likely rolled over after
he was shot.
          Viewing the evidence in the light most favorable to the verdict, we conclude
that a rational trier of fact could have found beyond a reasonable doubt that appellant
formed the intent to rob Flores either before or during the commission of the murder. 
See Johnson, 23 S.W.3d at 7. 
          We hold that the evidence is legally sufficient to support appellant’s
conviction. Accordingly, we overrule appellant’s second issue. 
D.      Factual Sufficiency Analysis 
          In her factual sufficiency challenge, appellant points to her own testimony and
pre-trial exculpatory statements, as follows: (1) immediately before he was shot,
Flores grabbed appellant hard enough to leave a bruise on her chest; (2) appellant was
not familiar with guns and only took the Iver Johnson revolver because she “liked it”
and wanted to sell it on Ebay; (3) appellant took the Iver Johnson revolver for
protection because she previously had been sexually assaulted; (4) when she took the
gun from the purse, appellant intended only to scare Flores; (5) Flores was shot
because the gun accidently “went off”; (6) appellant did not roll Flores over after he
fell to go through his pockets; (7) appellant neither robbed nor planned to rob Flores;
and (8) appellant went to stay at a motel after the shooting because she wanted to
“buy time” before she surrendered to ensure that her children were safely placed.
          The exculpatory evidence cited by appellant supports her defensive theory that
she possessed the gun for protection only, brandished it because Flores threatened
her, and then accidently shot Flores. Nonetheless, as discussed under our
legal-sufficiency review, ample evidence exists in the record to support the State’s
theory that appellant intentionally killed Flores in the course of committing or
attempting to commit a robbery. 
          The fact that appellant testified and made statements to support her defensive
claims is not enough to render the evidence insufficient to prove specific intent. See
Sells v. State, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003) (holding that defendant’s
own statement regarding his intent is not enough to render evidence, without more,
insufficient). Because the record has not clearly revealed that a different result is
appropriate, we must defer to the jury’s determination of the weight to be given the
contradictory evidence. See Johnson, 23 S.W.3d at 8. Resolution of this type of
conflict often turns on the juror’s evaluation of credibility and demeanor. Id. The
jurors had the opportunity to evaluate appellant’s statements regarding her lack of
intent to murder Flores or to commit robbery, and they chose not to believe it. For
these reasons, we give due deference to the fact-finder’s determinations, particularly
those determinations concerning the weight and credibility of the evidence. Id.
          In support of her factual-sufficiency challenge, appellant also points to the fact
that Flores was shot at close range and there was no evidence that she and Flores were
arguing before the shooting. When viewed neutrally, such evidence could arguably
support either the defense’s or the State’s theory of the case. Indeed, the jury could
have inferred that the evidence corroborated appellant’s testimony regarding the
moments preceding the shooting. On the other hand, the jury could have reasonably
inferred that such evidence showed that appellant lured Flores to the darkened carport
under a friendly pretext and then took out the Iver Johnson revolver, put it to his
head, and shot him to facilitate the robbery. 
          Appellant further points out that only one shot was fired and that the Iver
Johnson revolver was not a “high tech assault weapon.” She also points to a lack of
evidence that (1) she “waived the gun in a threatening manner and pointed it at
[Flores] prior to its discharge,” (2) she knew the weapon was loaded, or (3) she was
seen taking any property from Flores’s body. Appellant further calls attention to the
fact that the evidence showed that she did not have a criminal record. While such
evidence, or lack of evidence, arguably militates against the guilty verdict, other
evidence admitted at trial, as discussed in our legal-sufficiency analysis, supports it. 
          In addition, appellant cites evidence that the Iver Johnson revolver was an old
weapon that was manufactured between 1919 and 1957 and that ballistics testing
showed that it malfunctioned in the single-action mode. Evidence was introduced
that Aulds owned two other firearms in addition to the Iver Johnson revolver. 
Although he had told appellant that one of the weapons had a “hair trigger,” Aulds
had not told appellant which one was not functioning properly. However, the
evidence showed that the Iver Johnson revolver only malfunctioned when the hammer
was cocked; that is, it misfired only in the single-action mode. Appellant testified
that she was unsure of whether she had cocked the hammer before placing it in
Lang’s purse. Evidence that the Iver Johnson revolver was defective weighs against
a finding that appellant intentionally killed Flores; however, no evidence was
presented that the weapon was in the defective single-action mode when it discharged
killing Flores. Given the other evidence supporting the intent element, the jury was
free to disbelieve appellant when she testified that the Iver Johnson revolver fired
“accidently.” 
          Appellant also points out that, although she went to stay at a motel following
the shooting, she remained in touch with her boyfriend, stayed in Houston, and
surrendered to police within 36 hours of the shooting. When viewed neutrally, such
evidence arguably weighs against a guilty verdict. Nonetheless, in spite of the cited
evidence, the jury was equally free to infer that appellant’s fleeing her home and
checking into a motel was probative of her guilt.
          Lastly, appellant cites evidence that she had voluntarily consumed alcohol and
drugs in the hours preceding the shooting. We note that it is well-established that
voluntary intoxication does not negate intent. Tex. Pen. Code Ann. § 8.04 (Vernon
2003); Hawkins v. State, 605 S.W.2d 586, 588–89 (Tex. Crim. App. 1980).
          After viewing all of the evidence in a neutral light, we cannot conclude that the
evidence is so weak that the verdict is clearly wrong and manifestly unjust or that the
verdict is against the great weight and preponderance of the evidence. See Johnson,
23 S.W.3d at 11. We hold that the evidence is factually sufficient to support
appellant’s conviction.
          We overrule her third issue.
Informing Prospective Jurors of Mandatory Life Sentence
          Penal Code subsection 12.31(b) provides, in relevant part, as follows: “In a
capital felony trial in which the state does not seek the death penalty, prospective
jurors shall be informed that the state is not seeking the death penalty and that a
sentence of life imprisonment without parole is mandatory on conviction of the
capital felony.” Tex. Pen. Code Ann. § 12.31(b) (Vernon Supp. 2007). 
          In her sixth issue, appellant contends that the trial court abused its discretion
when it refused to allow the venire to be informed, as required by section 12.31(b),
that a sentence of life imprisonment without parole was mandatory if appellant was
convicted of capital murder. Appellant contends in her fourth and fifth issues that she
was denied effective assistance of counsel in contravention of the United States and
Texas Constitutions because, when the trial court prevented the venire’s learning of
the mandatory life sentence without parole, the trial court impermissibly limited the
defense’s ability to voir dire prospective jurors relating to the required imposition of
a life sentence without parole.
A.      Background
          Before voir dire, the trial court told the parties that it would be informing the
venire that (1) the State was not seeking the death penalty and (2) if the jury found
appellant guilty of capital murder, then the trial court would assess punishment, not
the jury. The trial court stated that neither it nor the attorneys should inform the
venire that the sentence for capital murder in this case would be life without parole. 
The trial court explained, “I don’t think it’s an issue that they need to know about .
. . it’s not for them to decide.” The court continued, “[I]f they convict her of capital
murder, then they need to know that trial is over for them at that point and that the
court will be doing the sentencing. If they convict her of a lesser, then they will be
doing the punishment.” 
          The defense objected, stating, 
We think the jury panel should be entitled to know. Since the State is
not seeking the death penalty and it is an automatic punishment assessed
by the court at that point in time, we think the jury panel should be
entitled to know that it is an automatic life sentence. Whether it’s
further defined as life without parole or not, we think they should at
least be told that the only punishment that the defendant can receive at
that point is life, so we would object and make a request that we be
allowed to go into that.
          The trial responded that it would “stand by” its ruling, but elaborated that the
parties could ask the venire, “Knowing that you are not going to assess punishment,
do you have any problem with deliberating guilt or innocence.” The court continued
that “any other question as to the actual effect of their verdict would be a commitment
question. So, I’m going to instruct the jury that, ‘The death penalty is not an option
in this case. If you convict her of capital [murder], the court will be doing the
sentencing.’” 
          Before the parties began voir dire, the trial court informed the venire “this is
not a death penalty case” and that the “only thing that a jury selected in this case will
be doing is determining the guilt or innocence of the defendant on capital murder.” 
The court further informed the venire that “if [appellant] is convicted of capital
murder, the court does the sentencing.”
B.      Limiting Voir Dire
          As mentioned, appellant contends in her fourth and fifth issues that she was
denied effective assistance of counsel in contravention of her federal and state
constitutional rights because the trial court impermissibly limited her right to question
prospective jurors regarding the required imposition of a life sentence without parole. 
We conclude that these two issues have not been preserved for our review. 
          With regard to limiting voir dire, the Court of Criminal Appeals recognized
that, to preserve error, an appellant must show that “he was prevented from asking 
particular questions that were proper.” Sells, 121 S.W.3d at 756. The court
explained, “That the trial court generally disapproved of an area of inquiry from
which proper questions could have been formulated is not enough because the trial
court might have allowed the proper question had it been submitted for the court’s
consideration.” Id.
          In this case, the record does not reflect what questions appellant would have
asked the venire. The trial court may have allowed proper questions even though it
did not generally approve of the line of inquiry. We cannot determine, without first
knowing the questions appellant planned to ask, whether the refusal was error, and
thus, whether appellant’s constitutional rights were violated. See id. Because
appellant did not show that she was prevented from asking a particular, proper
question, she failed to preserve error. See Mohammed v. State, 127 S.W.3d 163, 170
(Tex. App.—Houston [1st Dist.] 2003, pet. ref’d).
          We overrule appellant’s fourth and fifth issues.
C.      Violation of Section 12.31(b)
          The State concedes that it was error for the trial court to refuse to allow the
venire to be informed that appellant would receive a mandatory life sentence without
parole if the jury convicted her of capital murder, as required by Penal Code section
12.31(b). Although the provision is mandatory, “the violation of a mandatory statute
does not, by itself, call for the reversal of a conviction.” Ford v. State, 73 S.W.3d
923, 925 (Tex. Crim. App. 2002). Instead, we seek to determine whether appellant
was harmed by the error. See id. 
          Appellant contends that the error in failing to allow the jury to be informed
regarding the mandatory sentence, as statutorily required, was constitutional or
“structural” in nature. More specifically, appellant asserts that she was denied her
constitutional right to effective assistance of counsel because the statutory error
deprived her attorney of the ability “to intelligently exercise peremptory challenges”
during voir dire. We disagree that the error was constitutional.
          When only a statutory violation is claimed, as here, the error must be treated
as non-constitutional for the purpose of conducting a harm analysis. See Gray v.
State, 159 S.W.3d 95, 97–98 (Tex. Crim. App. 2005). This is true even when the
statutory right ensures the protection of a constitutional right. See id. at 97. As noted
by the Court of Criminal Appeals, “[M]any—perhaps most—statutes are designed to
help ensure the protection of one constitutional right or another. Having such a
purpose does not convert a statutory right into one of federal constitutional
dimension, much less a right whose violation is considered to be structural error.” 
Id. 
          Because it is non-constitutional, we disregard the trial court’s error in failing
to allow the venire to be informed that appellant would receive a mandatory life
sentence if convicted of capital murder, unless it affected appellant’s substantial
rights. See Tex. R. App. 44.2(b). A substantial right is affected when the error had
a substantial and injurious effect or influence in determining the jury’s verdict. King
v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Stated conversely, a
substantial right is not affected when, “the appellate court, after examining the record
as a whole, has fair assurance that the error did not influence the jury, or had but a
slight affect.” Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).
          In Ford, the Court of Criminal Appeals acknowledged the difficulties in
determining harm from statutory errors involving jury formation. 73 S.W.3d at 925. 
The Court recognized, “It is true that formulations that focus on the outcome of a case
are not quite apt in the context of a case in which the jury itself is the object of the
error.” Id. at 926. Rather, in conducting the harm analysis in such cases, the
appellate court should consider what right is protected by the statute. Id. Thus, the
proper inquiry here is whether the purpose of section 12.31(b) was thwarted by the
trial court’s error. See id.
          When we interpret a statute, we seek to effectuate the collective intent of the
legislators who enacted the legislation. Gray, 233 S.W.3d at 301. To identify the
collective intent or purpose, we necessarily focus our attention on the literal text of
the statute in question and attempt to discern the fair, objective meaning of that text
at the time of its enactment. Id. To reiterate, the text of section 12.31(b) reads, in
relevant part, “In a capital felony trial in which the state does not seek the death
penalty, prospective jurors shall be informed that the state is not seeking the death
penalty and that a sentence of life imprisonment without parole is mandatory on
conviction of the capital felony.” Tex. Pen. Code Ann. § 12.31(b). 
          A fair and objective reading of section 12.31(b) reflects that the right the
legislature sought to protect was a defendant’s right to a fair and impartial jury. Upon
hearing that the offense at issue is capital murder, most prospective jurors will
undoubtedly speculate that the jurors selected will be faced with deciding whether the
defendant receives a sentence of death. Section 12.31(b) assists in the selection of
a fair and impartial jury by removing from the venire members any speculation
regarding whether the jury would be asked to assess the death penalty and by
informing prospective jurors that they will not be called upon to determine
punishment. 
          To merit reversal in this case, the record must show that the error prevented
appellant from receiving a fair and impartial jury. To give effect to defendant’s right
to select a fair and impartial jury, a defendant is generally entitled to voir dire
prospective jurors on any matter which will be an issue at trial. Dinkins v. State, 894
S.W.2d 330, 344 (Tex. Crim. App. 1995); see Morris v. State, 940 S.W.2d 610, 613
(Tex. Crim. App. 1996) (holding that defendant was not entitled to question
prospective jurors in capital murder case regarding parole ineligibility because parole
is not matter for jury’s consideration in capital murder trial; hence, parole is not “an
issue applicable to the case” and questions about it are not proper questions). Thus,
because the jury does not consider or assess whether a defendant receives a
mandatory life sentence when the State does not seek the death penalty, a trial court’s
failure to allow the venire to be informed that the accused will receive a mandatory
life sentence without parole if the jury convicts her of capital murder does not
necessarily indicate that a defendant was prohibited from asking proper questions,
denied effective assistance of counsel, or selecting a fair and impartial jury. 
          Here, appellant was permitted to question the venire on the punishment issue
which was relevant to this case. The venire was informed that the State was not
seeking the death penalty and that the trial court would sentence appellant if she was
convicted of capital murder. Such information served to inform the venire that it was
not a death penalty case and that the decision of punishment would not be an issue
for the jury. The trial court permitted counsel to question the venire members
regarding this information. Specifically, the venire was questioned whether they
could determine appellant’s guilt with respect to capital murder knowing that they
would not be assessing the punishment. 
          Though the trial court erred when it did not allow prospective jurors to be
informed that appellant would receive a mandatory life sentence without parole if
convicted of capital murder, nothing in the record indicates that such failure to inform
the venire of this information denied appellant’s right to a fair and impartial jury, the
right that section 12.31(b) seeks to protect. Thus, we conclude that appellant’s
substantial rights were not affected by the error and hold that the error was harmless.
          We overrule appellant’s sixth issue. 
Entitlement to Criminally Negligent Homicide Instruction
          In her eighth issue, appellant contends that the trial court erred by refusing to
instruct the jury on the lesser-included offense of criminally negligent homicide, as
requested.


 A defendant is entitled to an instruction on a lesser-included offense if
(1) the lesser offense is a lesser-included offense of the charged offense and (2) there
is some evidence in the record that would permit a jury rationally to find that if the
defendant is guilty, she is guilty only of the lesser offense. Guzman v. State, 188
S.W.3d 185, 188 (Tex. Crim. App. 2006). We must review all evidence presented at
trial to make this determination. Lugo v. State, 667 S.W.2d 144, 147 (Tex. Crim.
App. 1984).
          Criminally negligent homicide is a lesser included offense of murder. 
Cardenas v. State, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000). Thus, as briefed
by the parties, the dispute in this case centers on whether there is some evidence from
which the jury rationally could have found that, if appellant was guilty, she was guilty
only of the lesser offense of criminally negligent homicide. See Guzman, 188 S.W.3d
at 188. At this step of the analysis, “the evidence must establish the lesser-included
offense as a valid, rational alternative to the charged offense.” Hall v. State, 225
S.W.3d 524, 536 (Tex. Crim. App. 2007).
          Criminally negligent homicide involves causing the death of another by
criminal negligence. Tex. Pen. Code Ann. § 19.05(a) (Vernon 2003). Criminal
negligence involves inattentive risk creation. Lugo, 667 S.W.2d at 148; Lewis v.
State, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975). The key to criminal negligence
is the failure of the actor to perceive the risk created by his conduct. Trujillo v. State,
227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d). Before a
charge on criminally negligent homicide is required, the record must contain evidence
showing an unawareness of the risk. Mendieta v. State, 706 S.W.2d 651, 653 (Tex.
Crim. App. 1986).
          Here, we must determine whether the record contains some evidence that
would permit a jury rationally to find that appellant did not appreciate the risk that,
as a result of her taking the gun from the purse, the gun could discharge, and Flores
could be killed. See id. Appellant points out that the State’s ballistics expert testified
that the Iver Johnson revolver was an old weapon that, when in the single-action
mode, required only three pounds of pressure to fire. The ballistics expert also
testified that testing revealed that the weapon was defective. Specifically, testing
showed that, when in the single-action mode, the weapon could discharge when
jostled. At trial, appellant testified that she could not remember whether she had
cocked the Iver Johnson revolver before placing it in the purse.
          Appellant testified that she was unaware of the gun’s defect, and had she
known, she would not have taken it. The evidence showed that the owner of the Iver
Johnson revolver, Clifford Aulds, owned two other firearms in addition to the
revolver. Appellant admitted at trial that Aulds had told her that one of the three guns
was “very dangerous,” but claimed she was unaware of which of the three guns was
defective. Aulds also confirmed that he had told appellant that one of the guns had
a “hair trigger.”
          We disagree with appellant that her claimed unawareness of the Iver Johnson
revolver’s defect was evidence supporting the submission of a criminally negligent
homicide instruction. Appellant was aware that one of the three weapons was “very
dangerous.” She claims that she did not know which one was “very dangerous.” 
Thus, it follows that she did not know which of the two weapons were not “very
dangerous.” By taking the Iver Johnson revolver without clarifying whether it was,
or was not, “very dangerous,” appellant cannot now claim that she unaware of the risk
posed by it when she removed it from her purse. 
          We recognize that appellant’s version of the facts characterizes the shooting
as an “accident”; however, a showing of accidental discharge does not necessarily
raise the issue of criminally negligent homicide. See Thomas v. State, 699 S.W.2d
845, 850 (Tex. Crim. App. 1985); see also Simpkins v. State, 590 S.W.2d 129, 133
(Tex. Crim. App. 1979) (holding that evidence of accidental discharge does not
necessarily raise issue of criminally negligent homicide, but may raise defense of
accident). That is, a showing that the defendant did not intend the result does not
automatically entitle her to a charge on criminal negligence. Trujillo, 227 S.W.3d at
168. Evidence of accidental discharge may raise an inference that the defendant did
not perceive a risk of injury or death, for example, when evidence is also presented
that the defendant was not aware that the gun was loaded. See Levan v. State, 93
S.W.3d 581, 585 (Tex. App.—Eastland 2002, pet. ref’d). Here, other than her own
testimony that she was “not very” familiar with firearms, appellant presented neither
evidence that she was unaware that the the Iver Johnson revolver was loaded nor
evidence that she did not appreciate the risk posed by the weapon. 
          A review of the record reveals that evidence was admitted from which it can
be inferred that appellant suspected that the gun was loaded and from which it can be
inferred that she perceived the risk posed by removing the weapon from the purse. 
Aulds testified that appellant had been concerned about the guns because she was
afraid that her children may be injured by the weapons, particularly her youngest
child. For this reason, Aulds had placed two of the weapons, including the the Iver
Johnson revolver, on top of the china cabinet. The evidence also showed that
appellant held the purse containing the weapon tightly as she sat in the bar on the
night of the shooting. From such evidence, a jury could infer that appellant
appreciated that the weapon posed a risk of injury. 
          In addition, according to her own testimony, appellant removed the Iver
Johnson revolver, a deadly weapon per se, from the purse in response to either a
verbal or physical threat by Flores. Such evidence does not necessarily raise an
inference that appellant was unaware of the risk posed by that conduct. To the
contrary, drawing a deadly weapon in response to a physical threat indicates that the
actor is not only aware of the risk posed by the weapon, but is choosing to exploit that
risk. Thus, some evidence shows that appellant perceived the risk posed by drawing
the weapon and choose to disregard that risk.
          Because the record does not contain evidence to show that appellant failed to
perceive the risk created by her conduct, and some evidence was presented indicating
that she was aware of the risk, the trial court did not err by refusing to instruct the jury
on criminally negligent homicide.
          We overrule appellant’s seventh issue. 
Conclusion
          We affirm the judgment of the trial court.
 
 

                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Nuchia, Hanks, and Higley.

Do not publish. See Tex. R. App. P. 47.2(b).