Affirmed and Memorandum Opinion filed October 16, 2008








Affirmed
and Memorandum Opinion filed October 16, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00680-CR

____________

 

ANTHONY DAVID OKUNNO, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 268th
District Court

Fort Bend County, Texas

Trial Court Cause No. 44,339-A

 



 

M E M O R A N D U M  O P I N I O N








A jury found appellant, Anthony David Okunno, guilty of
aggravated robbery.  After finding two enhancement paragraphs true, the jury
assessed punishment at thirty-five years= confinement in
the Texas Department of Criminal Justice, Institutional Division, and the trial
court sentenced appellant accordingly.  In three issues, appellant argues (1)
the evidence is insufficient to find appellant guilty of aggravated robbery
under the law of parties, (2) appellant=s statement was
improperly admitted, and (3) the evidence is insufficient because the testimony
of an accomplice witness was not corroborated.  Because our disposition is
based on clearly settled law, we issue this memorandum opinion and affirm.  See
Tex. R. App. P. 47.4

Factual Background

Michael Tornero owned an auto repair and rental business. 
Yolanda Vallejo worked for an attorney and referred clients to Michael. On
April 23, 2006, a Sunday, Yolanda telephoned Michael and arranged to bring a
cake to Michael=s home.   During a conversation the
previous Friday, Michael indicated to Yolanda he was Asitting on a lot
[of] cash@ because he had recently provided rental cars for a
large party.  Although Yolanda phoned Michael Sunday morning and the Torneros
were expecting her earlier in the day, she did not arrive at the Tornero home
until around nine o=clock that evening.

When Yolanda arrived, Michael welcomed her into his home. 
A few minutes later, Michael=s wife, Belda, joined them in the kitchen,
and Michael introduced them.  Both Michael and Belda thought Yolanda seemed
nervous.  At some point Yolanda left the house and went to her truck to get the
cake she purported to give Michael.  Intending to show Yolanda the house when
she returned, Michael went into a bedroom to straighten the room.  Belda stayed
in the kitchen and called her daughter, on a cell phone, to discuss plans for
that evening.

When Yolanda returned, Michael was still in the bedroom. 
As Yolanda walked toward the kitchen, Belda saw an Hispanic man, later
determined to be Omar Medrano, holding Yolanda and pointing a gun at Belda. 
Omar told Belda to drop the phone.  She immediately dropped the phone and
started screaming her husband=s name.  Omar let Yolanda go and started
walking toward the back of the house, pointing the gun and a laser sight Aeverywhere.@








Michael heard Belda screaming, saw the laser light in the
hallway, and knew there was a gun.  Michael got his revolver and pointed it at
the foyer.  He then saw Omar with a gun in his hand.  Michael fired at Omar,
but thought he had missed because Omar jumped back and fired four or five
times.  Michael pressed an alarm panic button which called the police.  As Fort
Bend Sheriff=s Detective Tully Mangum arrived, he saw a dark, newer
model, Chevrolet Impala, with at least two people, driving away very quickly. 
Michael and Belda were still in the house.

Yolanda died of a single gunshot wound.  The medical
examiner subsequently determined a shot fired from Omar=s gun had
ricocheted off a wall or the floor, striking Yolanda in the head.

The events leading to and following the robbery, including
Omar=s departure from
the scene, are set forth in the discussion below.

Discussion

I.        The
Evidence was Legally and Factually Sufficient to Support Appellant=s Conviction for Aggravated Robbery under the Law of
Parties.

 

In his first issue, appellant argues the evidence is
insufficient to support his conviction for aggravated robbery under the law of
the parties.  Appellant argues there was no evidence that (1) he did anything
or agreed to do anything in connection with the offense before it occurred, (2)
he was criminally responsible for the aggravating element of the offense
(deadly weapon), and (3) he was criminally responsible for the conduct of Omar,
Yolanda, or the other actors.  Appellant frames his argument in Ano evidence@ or legal
insufficiency terms, but requests remand for a new trial, the remedy when the
evidence is factually, but not legally, insufficient.  We therefore conduct
both reviews.








In
considering a legal-sufficiency challenge, we review all evidence in the light
most favorable to the finding and determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  In
examining a factual-sufficiency challenge, we view all evidence in a neutral
light and set aside the verdict A>only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.=@ Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (quoting Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996)).  Before we may reverse for factual
insufficiency, we must first conclude with some objective basis in the record,
that the great weight and preponderance of the evidence contradicts the jury=s verdict.  Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  As the court of criminal appeals
recently explained:

Both legal and factual sufficiency standards require the reviewing
court to consider all of the evidence.  AThe
difference between the two standards is that the former requires the reviewing
court to defer to the jury=s credibility
and weight determinations while the latter permits the reviewing court to
substitute its judgment for the jury=s
on these questions >albeit to a very limited degree.=@ In reality, a Afactual‑sufficiency
review is >barely distinguishable= from a Jackson v. Virginia legal sufficiency review.@

 

Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim.
App. 2007) (citations omitted).

A person commits robbery Aif, in the course
of committing theft . . . and with intent to obtain or maintain control of the
property, he . . . intentionally or knowingly threatens or places another in
fear of imminent bodily injury or death.  Tex. Penal Code Ann. ' 29.02(a)(2)
(Vernon 2003).  The offense is aggravated if the person uses or exhibits a
deadly weapon.  Id. ' 29.03(a)(3).  AA person is
criminally responsible as a party to an offense if the offense is committed by
his own conduct, by the conduct of another for which he is criminally
responsible, or by both.@  Id. ' 7.01(a).  AA person is
criminally responsible for an offense committed by the conduct of another if .
. . acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense . . . .@  Id. ' 7.02 (a)(2).  








A>In determining whether
the accused participated as a party, the court may look to events occurring
before, during and after the commission of the offense, and may rely on actions
of the defendant which show an understanding and common design to do the
prohibited act.=@  Ransom v.
State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (quoting Cordova v.
State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).  The State may prove
party status with circumstantial evidence.  Id.

Mere presence at the scene of the offense does not
establish guilt as a party to the offense.  Porter v. State, 634 S.W.2d
846, 849 (Tex. Crim. App. [Panel Op.] 1982).  Presence at the scene, however,
is a circumstance tending to prove guilt which, when combined with other facts,
may suffice to show that the accused was a participant.  Valdez v. State,
623 S.W.2d 317, 321 (Tex. Crim. App. [Panel Op.] 1979).  Although flight alone
will not support a Aguilty@ verdict, evidence
of flight from the scene of the offense is also a circumstance from which an
inference of guilt may be drawn.  Id. 

In the present case, appellant=s statements,
testimony from co-participant Monica Deleon, and physical evidence connect
appellant with the aggravated robbery and establish his responsibility.[1] 
That evidence relates to events before, during, and after the robbery.

Events leading to the robbery.  In his statement
to Officer Rivera, appellant described how he met Omar a few days before the
robbery.  Shortly after they met, Omar told appellant he did not trust his
present bodyguard, Guero, but did trust appellant.








According to appellant, around 6:00 p.m. on the night of
the robbery, Omar called appellant and asked, A>Do you want to
make some money and ride with us?=@  Appellant
admitted he Akind of knew what Omar meant by making some money,
because when I first met him he asked me to sale [sic] dope for him, but I told
him that I am not interested.@  Appellant then described the following
events:  Omar and Aan Hispanic girl@ picked appellant
up around 7:00 p.m. at the motel where he was living and drove him to a gas
station, where they met people in three other vehicles; they then drove to a
Wendy=s, where Omar told
appellant what he was going to do, i.e., meet business partners Athat did him wrong
and owed him lots of money.@  Appellant stated:

Omar told me that it was a million dollar deal.  I was sitting in the
back seat, Omar was in the front passenger side and the Hispanic girl was
driving.  Omar handed me a 40 caliber Glock with no clip and told me Athat=s for you@.  I gave it back to him and told him that I could not go
out like that.  Omar told me that all he wanted me to do was watch his back and
for me and the girl to be outside in case something when wrong.  He told me
that we were not going to be involved.

 

Appellant further stated that, while they were at Wendy=s, Omar took the
Glock from appellant and gave it to Guero.  Appellant moved to the front seat,
and Guero returned to the car and put a shopping bag on the floorboard. 
Appellant looked in the bag and saw what Aappeared to be a
9MM UZI, silver in color.@[2]  An Hispanic male
carrying a sawed-off shotgun wrapped in blue sheet got in the back seat.  Omar
then told appellant: A>[T]his is the
deal, it=s an inside job,
the white girl driving the truck is going to deliver a cake to the man who
lives at the house we were going to . . . .=  [W]hen the girl
went to the door and the man opened it she was going to go inside and when she
came back outside that was when he, Guero and Monster were going to go inside.@[3]








Deleon=s testimony describing events that
occurred just before she and Omar met appellant and her arrival at the scene of
the robbery generally paralleled appellant=s statement.  Shortly before Deleon
and Omar left Omar=s mother=s house the night of the robbery, Omar asked Deleon whether
she would like to make some money and told her it was a Amillion dollar mission.@ Omar told her it would not be
dangerous; all she had to do was wait by the side of the house for Omar to
exit.

Before
Deleon and Omar left to meet appellant, two other vehicles appeared at Omar=s mother=s house.  Frank Medrano, Omar=s brother, and a female were in one
of the vehicles.  A woman was in the second vehicle, a green Avalanche truck.

Deleon
and Omar met appellant at the motel where appellant was living.  Deleon was
driving her car, a black Camry.  Appellant got in the back seat, and they drove
to a gas station, where they met the person in the green Avalanche.  During the
trip, Omar was communicating with someone on a walkie talkie.

From the
gas station, they drove to a Wendy=s.  On the way, while Deleon was
stopped at a traffic signal, another male entered the vehicle and sat in the
back seat.  Deleon initially knew him as ABlack,@ and later as Egbert Trevino.

After
appellant, Deleon, Omar, and Trevino arrived at Wendy=s, two Avalanches appeared.  The
woman Deleon had seen earlier in the Avalanche was now accompanied by a male. 
A blonde woman Deleon later learned was Yolanda Vallejo was driving the other
Avalanche, which Deleon described as Alook[ing] just like Omar=s.@  Finally, Frank, the woman who was
with him earlier, and a teenager arrived in Frank=s car.  The men got out of the cars
and were talking.

Afterwards,
appellant got in the front passenger seat of Deleon=s car, and Trevino got in the back,
on the driver=s side.  As Trevino was walking toward Deleon=s car, Deleon saw him carrying a
black gun which was wrapped in a blanket.  Omar then brought a Foley=s bag to appellant.  Appellant took
the bag and put it on the floor in the front seat.  Appellant removed the gun
from the bag, Aa little bit, but not all the way.@  It was a big silver gun.  Deleon
also saw bullets in a box in the bag.








The cars
then left Wendy=s.  According to Deleon, Yolanda and Omar left first in one
of the Avalanches.  The other Avalanche left next, then Deleon, and finally
Frank.  Omar was instructing appellant by means of the walkie talkie.

At
the scene.  In
his statement, appellant described the following events that occurred on the
way to, and at, the scene:

When we left the Wendy=s parking lot
we drove I-10 west towards the Katy area and took an exit and made [a] left turn
to a residential area.  Omar called me on my cell phone and tells me that he
wanted me and the guy with the shotgun to meet him half way to the door of the
house.  I told Omar, Ano@ that I was not
going to get out and do it.  We were still following each other, the truck that
the White girl was driving was in front, the Avalanche was [the] second[.]
[T]he car I was in was third and Omar=s
brother=s Impala was last.  The White girl parked her truck in
front of a house and we saw the Avalanche leave.  I saw Omar=s brother driving around. . . .  We were driving
around trying to find the Avalanche and then parked where we could see the
White girls [sic] truck.   After we parked we heard about three to four
gunshots and the Hispanic girl got scared and started the engine and was going
to drive off.  After hearing the gunshots we saw Omar walking on the sidewalk
walking towards us.  The Hispanic male sitting in the back seat with the
shotgun got out of the car and went to Omar.  When Omar got into the back seat
of the car, he said something in Spanish. . . . I asked what he said and the
Hispanic male said Omar had been shot.

 

According
to Deleon, after they exited the freeway and were in the subdivision, the
Avalanche with Yolanda and Omar stopped in the driveway of a house.  The other
Avalanche kept going, and Deleon never saw it again.  Deleon also kept driving,
but Omar contacted appellant on the walkie talkie and told appellant to direct
Deleon to stop.  Deleon initially parked in a cul-de-sac, but Omar told appellant
to return and park anywhere near the house.  As Deleon was driving toward the
house, she passed Frank=s car.  A video taken by a surveillance camera on the
Torneros= front porch showed Yolanda, and also
two cars, passing the Torneros= house.








Less
than five minutes after Deleon parked, she saw Yolanda leave the house, go to
the truck, and return to the house with Omar holding her by the neck.  When
Yolanda and Omar entered the house, appellant and Trevino said, AGet ready.@  Deleon heard two clicks, one to her
right, and one behind her.  It sounded like guns being loaded, but she did not
see them.  Deleon then heard three  gunshots and saw Omar running from the
house.  Omar fell in the grass about a yard from Deleon=s car.  Trevino exited the car,
picked Omar up, and put him in the backseat.  Omar was covered with, and
coughing up, blood.  Omar told Deleon to go, and she drove straight away.  She
did not know where Frank was.  As Deleon was leaving the subdivision, Trevino
was trying to contact Frank to tell him Omar was dead.

The
flight.  In his
statement, appellant described leaving the scene of the robbery:

After Omar got into the car we all panicked and the Hispanic girl
begins to drive very fast and I had to calm her down, so we could do something,
get some help for Omar.  I still had the UZI in front of me it was still in the
bag.  As we were driving around I wrapped the UZI in some clothing and tossed
it out of the car.  I believe I saw a sign that said Westhemier [sic], but I am
not certain.  The Hispanic male with the shotgun also tossed the shotgun out
the window somewhere on the feeder road of I-10.

As we drove around trying to make a decision on what to do, Omar=s brother called the Hispanic male . . . .  The
Hispanic male told me that Omar=s brother
wanted us to get Omar out of the car and call 911 so that he could be picked
up. . . .  I told them that I was going to call 911 and the Hispanic male and
Omar=s brother said not to because we would all go to
jail.  I decided to call 911 because Omar needed help.

 

According
to Deleon, when they finally were out of the subdivision, they came to a bridge
over Akind of like a bayou.@  Appellant opened the window and
threw the gun over the bridge.  Trevino did not dispose of his gun at that
time.

Appellant,
Deleon, and Trevino eventually stopped at a restaurant parking lot.  Trevino got
Omar=s clothes, and, at that point, Deleon
saw a bullet proof vest.  Trevino gave Omar=s clothes to  appellant, and he threw
them and the bullet proof vest into a dumpster.








According
to Deleon, as they drove on, Trevino and Frank were talking with each other,
trying to determine where to meet and what to do.  Trevino eventually called
911 and told Deleon to stop the car.  Trevino and appellant removed Omar=s body from the car and left it by a
bush.  Appellant, Deleon, and Trevino then met Frank in another parking lot. 
Deleon believed that, at some point, Frank called 911.  Everyone returned to
Omar=s body, and a few minutes later the
police and an ambulance arrived.

Statements
and evidence collected at the site of Omar=s body.  Harris County Sheriff=s Department Investigator Felipe Rivera talked
briefly with appellant at the site of Omar=s body.  Appellant
told Rivera where he could find the bullet-proof vest.  Appellant also told
Rivera about disposing of the UZI somewhere on Westheimer.  Officers recovered
a Glock .40 caliber weapon, a laser sight, .40 caliber ammunition, and a Foley=s bag in the area
around Omar=s body.  There were two cars present:  a Toyota Camry
and an older model Impala.  Officers found blood spatter and live gun shot
shells in the back seat of the Toyota.








Summary.  The evidence established that appellant
was with Omar and the other co-participants for at least two hours before the
robbery.  Appellant Akind of knew what Omar meant by making
some money.@  Appellant knew of the plan to have Yolanda deliver a
cake as a means of gaining entry into the Torneros= house.  Appellant
knew Omar wanted appellant there to Awatch his back . .
. in case something went wrong.@  At least from the point when everyone
met at Wendy=s, appellant knew guns were involved.  On the way to
the robbery, Omar was giving appellant instructions via a walkie talkie or
cellular phone, and appellant was conveying them to Deleon.  Appellant was
within arm=s reach of an UZI. While in the car outside the
victims= house, appellant
would have been in a position to see how Omar held Yolanda as they went toward
or into the house.  When Yolanda and Omar entered the house, appellant and
Trevino said, AGet ready,@ and Deleon heard
two clicks, one to her right, and one behind her. Appellant disposed of the UZI
and Omar=s bullet proof
vest after the robbery.  Considering all the evidence in the light most
favorable to the verdict, we conclude that a rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt.  See
King, 29 S.W.3d at 562 . 

The only evidence even potentially contradicting appellant=s intent to
promote or assist in commission of the offense (but not contradicting evidence
of his knowledge of the nature of the offense to occur) consists of appellant=s statements that
(1) he refused to take the Glock from Omar and (2) he told Omar at the scene of
the robbery he was not getting out of the car.  Having viewed all the evidence in a neutral light, we
cannot conclude the great weight and preponderance of the evidence contradicts
the jury=s verdict.  See Watson, 204
S.W.3d at 417.

In sum,
the evidence was legally and factually sufficient to support appellant=s conviction of aggravated robbery as
a party to the offense.  Accordingly, we overrule appellant=s first issue.

II.       The Trial Court Correctly Exercised its Discretion in
Admitting Appellant=s Statement

In his second issue, appellant contends the trial court
erred in admitting the statement appellant made to Officer Rivera.  Appellant
gave his statement at the Sheriff=s detective bureau
office between 8:00 and 9:30 a.m. the morning after Harris County officers had
responded to an 11:00 p.m. call regarding Omar Medrano=s homicide and had
transported five persons, including appellant, from that location to the bureau
office.[4]  
The officers conducted the interviews in separate cubicles at the bureau
office.

Appellant did not file a pretrial motion requesting the
trial court to suppress the statement.  Appellant objected at trial only after
defense counsel had referred to specifics of the statement in his opening
remarks and Rivera had testified about circumstances under which he took
appellant=s statement.  Appellant=s objection, in
its entirety, was as follows:








Your Honor, I=m going to object because [appellant] was being detained at
the time, although [Rivera] has testified that he could have stopped this at
anytime and he was free to leave, but it=s obvious that he was surrounded by police officers.  He
didn=t have a lawyer present.  So
whatever consent he gave towards the statement, it was not freely and
voluntarily given.  So I=m asking the court the suppress the
statement and not allow it into evidence.

 








Appellant now raises three complaints regarding admission
of his statement.  First, he complains that the trial court did not Amake an
independent finding outside the presence of the jury as to whether the
statement was made under voluntary conditions@;[5]
second, that his statement was not freely and voluntarily given because he was
in custody at the time he gave the statement; and third, that the trial court
did not instruct the jury on the law pertaining to the voluntariness of
statements.

Findings by the trial court.  On April 18,
2008, this court ordered the appeal abated and directed the trial court Ato  reduce its
findings of fact and conclusions of law on the voluntariness of appellant=s confession and
have a supplemental record containing those findings filed with the clerk of
this Court . . . .@  See Urias v. State, 155 S.W.3d
141, 142 (Tex. Crim. App. 2004); McKittrick v. State, 535 S.W.2d 873,
876  (Tex. Crim. App. 1976). The trial court has done so.  Therefore, appellant=s first complaint
is moot.  Rocha v. State, 16 S.W.3d 1, 10 (Tex. Crim. App. 2000).

Voluntariness of the statement.  Appellant=s argument that
his statement was involuntary rests solely on his contention he was Ain custody@ at the time he
gave his statement.  He challenges the officers= testimony to the
contrary.  The trial court, however, found that the law officers were credible
and the defendant was Anever in custody during the pertinent time
periods.@  The trial judge
is the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given to their testimony.  See State v. Ross, 32 S.W.3d
853, 855 (Tex. Crim. App. 2000).








Nevertheless, even were we to conclude appellant was in
custody at the time he gave his statement, that circumstance would not, in
itself, render his statement involuntary.  A statement may be deemed
involuntary in three circumstances:  (1) noncompliance with Code of Criminal
Procedure article 38.22;  (2) noncompliance with the dictates of Miranda v.
Arizona;[6] 
or (3) a violation of due process or due course of law because the statement
was not freely given (e.g., coercion, improper influences, incompetence).  Wolfe
v. State, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996).  A confession is
involuntary in violation of due process Aonly if there was
official, coercive conduct of such a nature that any statement obtained thereby
was unlikely to have been the product of an essentially free and unconstrained
choice by its maker.@  Alvarado v. State, 912 S.W.2d
199, 211 (Tex. Crim. App. 1995); see also Cravin v. State, 95 S.W.3d
506, 510 n.3 (Tex. App.CHouston [1st Dist.] 2002, pet. ref=d) (AThe Texas Due
Course of Law provision has not been held to provide any greater protection
than that afforded by the United States Constitution=s Due Process Clause.@).  A court bases
its determination of whether a confession is voluntary on an examination of the
totality of the circumstances.  Ramirez v. State, 116 S.W.3d 55, 58
(Tex. App.CHouston [14th Dist.] 1998, pet. ref=d).  Relevant
circumstances for determining whether a defendant=s will has been
overborne include Alength of detention, incommunicado or
prolonged interrogation, denying a family access to a defendant, refusing a
defendant's request to telephone a lawyer or family, and physical brutality.  A
defendant=s characteristics and status, as well as the conduct
of the police, are important concerns.@  Armstrong v.
State, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985) (citations omitted).








Contrary to appellant=s representation
on appeal, the face of his statement and Officer Rivera=s testimony
indicate appellant was read his Miranda and statutory rights and waived
them.[7] 
Uncontradicted testimony supports the trial court=s findings that
(1) appellant was not under arrest or handcuffed as he was transported to, or
while he was at, the bureau office; (2) he was offered something to drink and a
bathroom break when he first arrived at the office; (3) he was read his Miranda
and statutory rights; (4) he indicated he understood his rights by placing his
initials next to the rights on his written statement; (5) he never invoked any
of his rights; and (6) no one coerced appellant to make a statement.  The trial
court did not abuse its discretion in denying appellant=s motion to
suppress his statement.  See Swain v. State, 181 S.W.3d 359, 365 (Tex.
Crim. App. 2005) (AWe review a trial court=s ruling on a
motion to suppress evidence for an abuse of discretion.@).  Appellant=s second complaint
is without merit.

Lack of a jury instruction on voluntariness.  AWhen the issue [of
the voluntariness of the accused=s statement] is
raised by the evidence, the trial judge shall appropriately instruct the jury,
generally, on the law pertaining to such statement.@  Tex. Code Crim.
Proc. Ann. art. 38.22  ' 7.  In the
present case, however, there was no evidence before the jury raising the
question of the voluntariness of appellant=s statement. 
Accordingly, the trial court was not required to submit an instruction.  See
Wiley v. State, 632 S.W.2d 746, 748 (Tex. Crim. App. 1982) (holding no
merit in appellant=s contention trial court erred by failing
to submit voluntariness issue to jury when the record failed to show request
for instruction or that issue was raised before jury); Brownlee v. State,
944 S.W.2d 463, 468 (Tex. App.CHouston [14th Dist.] 1997, pet. ref=d) (same); see
also Butler v. State, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994) (A[B]efore the
requested instruction is required, some evidence must be presented to the jury
which raises the issue of voluntariness.@).

Having found no merit in appellant=s three complaints
related to the voluntariness of his statement to Officer Rivera, we overrule
his second issue.

III.      Appellant=s Conviction does not Rest on the Uncorroborated
Testimony of an Accomplice

 

In issue three, appellant contends the evidence is
insufficient to sustain the conviction because the testimony of an accomplice
witness was not corroborated.  The witness was Monica Deleon, who drove one of
the vehicles to the scene of the Fort Bend robbery and in whose car Omar
Medrano fled the scene and died.








Under the accomplice-witness rule, a defendant cannot be convicted based on the
testimony of an accomplice unless the testimony is corroborated by other
evidence tending to connect the defendant with the offense committed.  Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).  Corroboration is insufficient
if it merely shows commission of the offense.  Id.

To determine whether sufficient corroboration exists, we
eliminate the accomplice witness=s testimony from
consideration and then determine whether any of the remaining evidence tends to
connect the accused with commission of the crime.  Longoria v. State,
154 S.W.3d 747, 758 (Tex. App.CHouston [14th Dist.] 2004, pet. ref=d).  The
corroborating evidence need not directly link the accused to commission of the
offense, nor must it be sufficient in itself to establish guilt.  Id. 
In other words, it is not necessary for the non-accomplice evidence to connect
the defendant with every element of the crime.  Vasquez v. State, 56
S.W.3d 46, 48 (Tex. Crim. App. 2001).  The accomplice-witness rule is satisfied
if there is some non-accomplice evidence that tends to connect the accused to
commission of the offense alleged.  Longoria, 154 S.W.3d at 758.

A defendant=s presence in the company of the
accomplice before, during, and after commission of the offense coupled with
other suspicious circumstances may tend to connect the defendant to the
offense.  Thompson v. State, 54 S.W.3d 88, 93B94 (Tex. App.CTyler 2001,
pet.ref=d) (citing Dowthitt
v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)).  A defendant=s confession may
sufficiently corroborate an accomplice=s testimony, so
long as proof of the confession does not depend on the accomplice=s testimony.  Id.
at 94 (citing Farris v. State, 819 S.W.2d 490, 495 (Tex. Crim. App.
1990), overruled on other grounds by Riley v. State, 889 S.W.2d 290, 300
(Tex. Crim. App. 1993)).








In our discussion of legal and factual sufficiency of the
evidence above, we separated Deleon=s testimony from
the remaining evidence establishing appellant=s guilt.  The
remaining evidence consisted primarily of appellant=s oral and written
statements.  This non-accomplice evidence clearly connected appellant with
commission of the offense.  At a minimum, it established that (1) appellant
knew in advance how the robbery was to be conducted, (2) was aware weapons were
involved, (3) knew Omar wanted Deleon, Trevino, and appellant to Awatch his back,@ (4) received
instructions from Omar on the way to the robbery, (5) had access to a weapon
during the robbery, and (6) disposed of evidence after the robbery.
Accordingly, we conclude that Deleon=s testimony was
sufficiently corroborated.  Appellant=s third issue is
overruled.  

The judgment of the trial court is affirmed.

 

 

 

 

 

/s/      Charles Seymore

Justice

 

 

Judgment rendered
and Opinion filed October 16, 2008.

Panel consists of
Justices Yates, Seymore and Boyce.

Do Not Publish C Tex. R. App. P. 47.2(b).

 

 









[1]  As discussed in issues two and three, respectively,
we conclude the trial court correctly exercised its discretion in admitting
appellant=s statement, and Deleon=s testimony was sufficiently corroborated to support appellant=s conviction.





[2]  Later in his statement, appellant said:

 

At the time that Omar handed the first gun I said ANO@ and gave it
back to him.  When he handed me the second gun that was in the bag, I felt that
I could not say no because the guy sitting behind in the car had a shotgun, so
I felt that I had to go along with them the best way I could and felt that I
was in danger and could be shot if I did not go along with them.





[3]  Monster is not otherwise identified.





[4]  Although Officer Fikaris referred to six persons,
Officer Rivera referred to only five.





[5]  In support, appellant cites section 6 of the Code of
Criminal Procedure Article 38.22, which provides:

 

In all cases where a question is raised as to the
voluntariness of a statement of an accused, the court must make an independent
finding in the absence of the jury as to whether the statement was made under
voluntary conditions.  If the statement has been found to have been voluntarily
made and held admissible as a matter of law and fact by the court in a hearing
in the absence of the jury, the court must enter an order stating its
conclusion as to whether or not the statement was voluntarily made, along with
the specific finding of facts upon which the conclusion was based, which order
shall be filed among the papers of the cause.  Such order shall not be
exhibited to the jury nor the finding thereof made known to the jury in any
manner.  Upon the finding by the judge as a matter of law and fact that the
statement was voluntarily made, evidence pertaining to such matter may be
submitted to the jury and it shall be instructed that unless the jury believes
beyond a reasonable doubt that the statement was voluntarily made, the jury
shall not consider such statement for any purpose nor any evidence obtained as
a result thereof.  In any case where a motion to suppress the statement has
been filed and evidence has been submitted to the court on this issue, the
court within its discretion may reconsider such evidence in [its] finding that
the statement was voluntarily made and the same evidence submitted to the court
at the hearing on the motion to suppress shall be made a part of the record the
same as if it were being presented at the time of trial.  However, the state or
the defendant shall be entitled to present any new evidence on the issue of the
voluntariness of the statement prior to the court=s final ruling and order stating its findings.

 

Tex.
Code Crim. Proc. Ann. art. 38.22 
' 6  (Vernon 2005).

 

Appellant complains only about the trial court=s not having made a finding on voluntariness outside
the jury=s presence, not about the lack of a hearing outside
the jury=s presence.  He does not suggest there is any evidence
he could have presented other than that elicited from the officers who
testified at trial.  That evidence did not raise a question of voluntariness. 
When an accused gives a statement to law enforcement authorities and testimony
at trial does not challenge the voluntariness of the statement, an objection on
the grounds of involuntariness, without more, is insufficient to create a fact
issue requiring the trial court to conduct an inquiry into whether the
statement was made voluntarily.  See Miller v. State, 666 S.W.2d 269,
273B74 (Tex. App.CDallas
1984, pet. ref=d), cited with approval in Moore v. State, No.
14-89-00008-CR, 1990 WL 151285 at *1 (Tex. App.CHouston [14th Dist.] Oct. 11, 1990, no pet.) (not designated for
publication).

 





[6]  384 U.S. 436, 86 S. Ct. 1602 (1966).





[7]  See Miranda, 384 U.S. 436, 86 S. Ct. 1602;
Tex. Code Crim. Proc. Ann. art.
38.22  ' 2 (Vernon 2005).