# NO. 12-08-00376-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *ANTONIO ATES,*<br>*APPELLANT* | § | *APPEAL FROM THE 241ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Antonio Ates appeals his conviction for engaging in organized criminal activity, for which he was sentenced to imprisonment for life. In one issue, Appellant argues that the evidence was legally and factually insufficient to support the trial court's judgment. We affirm.

### BACKGROUND

On September 8, 2007, Christopher Ervin and his daughter attended a high school football game at Rose Stadium in Tyler, Texas. As the two attempted to exit the stadium parking lot by car, they came upon a group of people standing in the roadway. Ervin exited his car and asked the group to move so they could pass. In response, a young man shouted an obscenity at Ervin. Ervin pointed at the young man and told him he should "not be talking like that." A verbal confrontation ensued between the two. As the confrontation escalated, someone struck Ervin, rendering him unconscious. Thereafter, a group of fifteen to twenty young men hit and kicked Ervin repeatedly while he lay unconscious on the ground. During the assault, Ervin's daughter attempted to protect Ervin by laying on top of him. As the onslaught continued, Ervin's daughter sustained a broken arm. Ervin's injuries were extensive and included swelling of his eyes and face, head injuries, and loss of his ability to smell or taste.

Appellant was charged with engaging in organized criminal activity in connection with the

assault on Ervin and pleaded "not guilty." The matter proceeded to a jury trial. Ultimately, the jury found Appellant "guilty" as charged. Following a trial on punishment, the jury assessed Appellant's punishment at imprisonment for life. The trial court sentenced Appellant accordingly, and this appeal followed.

**EVIDENTIARY SUFFICIENCY**

In his sole issue, Appellant argues that the evidence was neither legally nor factually sufficient to support the trial court's judgment. Specifically, Appellant contends that the evidence is insufficient to support that (1) he was the person who assaulted Ervin, (2) he was present when the assault occurred, (3) he committed an overt act that would constitute his promoting or assisting in the commission of the assault, or that (4) he was a party to the commission of the assault.

**Legal Sufficiency**

Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979); *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.* The use of the hypothetically correct jury charge applies to review for both legal and factual sufficiency. *See Wooley v. State*, 273 S.W.3d 260, 261 (Tex. Crim. App. 2008).

In the case at hand, to support Appellant's conviction for engaging in organized criminal

activity, the State was required to prove that Appellant committed or conspired to commit aggravated assault as a member of a criminal street gang. *See* TEX. PENAL CODE ANN. 71.02(a)(1) (Vernon Supp. 2008). A person is criminally responsible as a party to an offense if the offense is committed by the conduct of another for which he is "criminally responsible." *See* TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003). A person is "criminally responsible" for an offense committed by the conduct of another if, while acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, or attempts to aid the other person to commit the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(1) (Vernon 2003). Here, Appellant does not challenge the sufficiency of the evidence supporting that he was a member of a criminal street gang. As such, we will focus our analysis primarily on evidence pertaining to Appellant's involvement in Ervin's assault.

*Evidence Pertaining to Appellant's Involvement in the Assault on Ervin*

The State's first witness, Tyler Police Department Officer Judson Moore, testified that he arrived at the scene following the assault on Ervin. Moore further testified that he sought to gather information about what had happened to Ervin. Moore stated that two people came forward to provide information to another officer at the scene. Moore further stated that in a gang related situation such as this, people's unwillingness to assist police is not uncommon because they fear retaliation.

Ervin testified next on the State's behalf. Ervin described how he attended the football game with his daughter on the night in question. Ervin further described how the two were attempting to exit the Rose Stadium parking lot in his vehicle that night. Ervin stated that he engaged in a verbal altercation with the young man who had yelled an obscenity at him and that, as the verbal jousting between the two of them continued, he became surrounded by a number of people and was suddenly "knocked out." Ervin testified that he had no further memory of the events in question after he was knocked out. Ervin further testified concerning his injuries. Specifically, Ervin stated that his eyes were swollen completely shut, the back of his head was split, which required staples and resulted in his suffering headaches, and he lost his senses of smell and taste.

D.T. testified as the State's next witness. D.T. testified that he saw Montrell and Brandon

High and others stomping on Ervin while he lay unconscious on the ground. D.T. further testified that when he spoke to authorities on the night in question, he related that he thought he heard that a person known as "Polly" was "in on the assault." D.T. identified Appellant as "Polly." D.T. further stated that everything he told authorities that night was truthful. On cross examination, D.T. testified that he did not see Appellant anywhere near Ervin on the night in question, nor did he see Appellant hit or kick Ervin. On redirect examination, the State elicited testimony from D.T. concerning signed stipulations from multiple participants in Ervin's assault, none of whom D.T. could testify that he knew.

T.C. testified next on the State's behalf. T.C. testified that he saw a lot of people beating Ervin while he was unconscious. T.C. further testified that he was concerned about something bad happening to him because of what he saw that night. T.C. stated that he recalled D.T. telling authorities that someone named "Polly" was involved in the assault on Ervin along with Montrell and Brandon High. T.C. further stated that he told law enforcement personnel the truth about what he observed that night. On redirect examination, T.C. testified that he told authorities that "Polly" was involved in the assault on Ervin. On recross examination, T.C. testified that he did not see Appellant that night. Upon further redirect, the prosecuting attorney refreshed T.C.'s recollection with a police report. Thereafter, T.C. testified that if Polly was seen there, then he was involved with the people assaulting Ervin. T.C. elaborated that when he and D.T. approached the scene after the assault, multiple people told them that Polly was involved in the assault along with others.

A.T. testified as the State's next witness. A.T. testified that she attended the football game in question and, following the game, she saw someone hit Alvin Gordon in the back of his head. A.T. further testified that Gordon fell to the ground and was beaten by numerous people. According to A.T., Appellant, whom she knew as "Polly," was among the people who attacked Gordon. A.T. stated that she told law enforcement at that time that she saw the same group, including Appellant, who attacked Gordon run about three feet away from her and begin beating "another guy." A.T. further stated that she was scared to testify in court that day. A.T. elaborated on her fear and testified that she received a phone call at 2:00 a.m. the morning of trial. She stated that (1) the caller told her not to testify or something "would get done" to her and her family and (2) the caller knew where she lived. A.T. testified that this was not the first instance in which she had been

4

threatened with regard to her testifying about what she saw that night. On cross examination, A.T. testified that she had told some people that she believed she was mistaken about whether "Polly" was involved in the assault on her cousin. A.T. further testified that she said she was mistaken as a result of a friend's advice in the hope that saying such a thing would lessen the pressure on and hatred toward her because of what she witnessed that night. A.T. also stated that, earlier that year, Appellant had asked her if she wanted to get "jumped in" to the "Rolling Sixties."[1]

Subsequently, Alvin Gordon testified on the State's behalf. Gordon recounted the events that led to his being attacked on the night in question. Gordon stated that he was hit from behind, fell to the ground, and was stomped on as he tried to crawl away. Gordon further stated that he could not identify any of his attackers.

J.A. testified as the State's next witness. J.A. testified that, on the night in question, she saw Appellant together with Montrell High, Brandon High, Ernest Porter, James Jones, Jerrell Amie, Roderick Houston, and Rodney Houston in the Rose Stadium parking lot. J.A. further testified that she saw Ervin being assaulted. J.A. stated that she spoke to Tyler Police Department Detective Chris Miller a few days after the incident and that what she told Miller at that time was the truth. J.A. further stated that it was her understanding of gang behavior that if one member of a gang fights, then all gang members have to fight. J.A. testified that Appellant was a member of the Westside Crips. J.A. further testified that the people who attacked Ervin were also members of the Westside Crips. However, J.A. stated that she never saw Appellant involved in the assault on Ervin.

L.W. testified next on the State's behalf. L.W. stated that she had attended the football game on the night in question. Though L.W. denied knowing Appellant at the time of trial, she testified that she spoke to authorities near the time of the incident. L.W. testified that she had told authorities the truth at that time. L.W. further testified that she brought up a person named "Polly" to authorities. L.W. identified Appellant as the person she knew as "Polly" and further stated that Polly was among those who beat Ervin on the night in question. L.W. stated that she did not want to be in court testifying and that "some people" did not want her to be in court that day. On cross

---

[1] The record reflects that "Westside Crips," "Westside Crips Rolling Sixties," and "Rolling Sixties" are each referable to the same organization.

examination, L.W. testified that she did not see Appellant hit or kick Ervin that night.

Tyler Police Department Officer James Turner testified as the State's next witness. Turner testified that he was dispatched to the scene on the night in question. Upon his arrival, Turner found Ervin lying in the middle of the road with several individuals around him. Turner stated that there were approximately two hundred people present at the scene, but only three were willing to speak to him about the incident involving Ervin. Turner stated that when he was dealing with assaults involving gang members, based on his training and experience, people are less likely to come forward with information because they fear retaliation. Turner further stated that he interviewed D.T. and T.C. on the night in question. Turner testified that D.T. and T.C. approached him and told him they knew who had assaulted Ervin. Turner further testified that D.T. told him that, among others, an individual they knew as "Polly" assaulted Ervin. Turner stated that T.C. agreed with D.T.'s assertion that "Polly" assaulted Ervin.

Former Tyler Independent School District ("TISD") Police Officer David Telemontes testified next on the State's behalf. Telemontes testified that he had been stationed at Robert E. Lee High School in Tyler and was familiar with a gang known as the Westside Crips. Telemontes further testified that he was familiar with Appellant, who was a student at Robert E. Lee High School during that time period. Telemontes stated that he observed Appellant engaged in activities consistent with his being a member of the Westside Crips gang. Telemontes further stated that a person who is a member of a criminal street gang is prone to be more violent than an individual who is not in a gang. Telemontes discussed an incident where he reprimanded Appellant for tapping on his gun belt. Telemontes testified that Appellant stated to him, "I am the West[.] You'd better let me go." Telemontes further testified that he understood Appellant to be referring to his membership in the Westside Crips.

TISD officer Andrew Whitfield testified next on the State's behalf. Whitfield testified that he had been assigned to Robert E. Lee High School campus for four years. Whitfield further testified that he was familiar with a gang known as Westside Crips Rolling Sixties. Whitfield stated that he was familiar with Appellant and had confiscated gang related paraphernalia from him in the past. Whitfield further stated that, based on his experience with Appellant, he believed that Appellant was an active member in the Westside Crips. On cross examination, Whitfield recounted

6

that Appellant had taken part in assaults on the Robert E. Lee campus.

Detective Miller testified as the State's next witness. Miller testified that he is the department's youth crimes investigator as well as the gang intelligence officer for the City of Tyler. Miller discussed gang activities generally as well as specific information regarding the Westside Crips. Miller stated that the purpose of a gang is profit, be it money, reputation, or intimidation. Miller elaborated that an example of such intimidation would be witness tampering—contacting individuals that are preparing to testify and intimidating them by means of threats on them and/or their family members. Miller further stated that, based on the information he had gathered on Appellant, he concluded that Appellant is a member of the Westside Crips Rolling Sixties. Miller testified that during his investigation, he determined that several of Ervin's assailants were members of the Westside Crips and that some were members of the Northside Crips. Miller further testified that when interviewing witnesses in such cases, it is important to obtain a recorded statement from that witness soon after the incident in question because of the intimidation factor with gang members. Miller stated that he interviewed J.A. and L.W. Miller further stated that J.A. told him that Appellant was involved in Ervin's assault. A tape recording of Miller's interview with J.A., in which she stated that she saw Appellant assaulting Ervin, was played for the jury. Miller testified that L.W. and A.T. told him that Appellant was involved in the Alvin Gordon assault, which was prior to the assault on Ervin, and that the same group who perpetrated that assault also assaulted Ervin. Miller further testified that T.A., T.T., and D.T. identified Appellant as being involved in Ervin's assault. Miller explained that, based on his investigation, he concluded that Appellant was actively involved in the assault as opposed to being a mere "cheerleader." Miller summarized his previous testimony, stating that it was his expert opinion that Appellant committed an assault against Ervin by hitting or kicking him as a member of criminal street gang.

Ervin's daughter testified next on the State's behalf. Ervin's daughter recounted how she attended the football game with Ervin on the night in question, but testified that she could not identify any of Ervin's assailants. Ervin's daughter further testified that she had received threats concerning her testimony. Following Ervin's daughter's testimony, the State rested.

Michael Hunter testified as Appellant's first witness. Hunter testified that Appellant is his

7

cousin. Hunter further testified that he attended the football game with Appellant on the night in question. Hunter stated that, following the game, he, Appellant, and Broderick Woods drove to Taco Bell®. Hunter further stated that, after speaking to some friends at Taco Bell®, the three went to his house where they spent the night. On cross examination, Hunter denied repeatedly that Appellant was a member of the Westside Crips.

Jessica Osborn testified next on Appellant's behalf. Osborn testified that Appellant is her younger brother. Osborn further testified that she attended the football game at Rose Stadium on the night in question. Osborn stated that she saw Appellant leave with Hunter and Woods after the game. Osborn further stated that she subsequently saw the incident involving Ervin. Osborn testified that Appellant was neither a party to this incident, nor was he present at the scene at the time the incident occurred. Osborn further testified that she attempted to help Ervin following the attack. On cross examination, Osborn stated that Appellant was at Taco Bell® at the time of the incident involving Ervin. Osborn further stated that Appellant goes by the name "Pauley," but is not a gang member.

Woods testified as Appellant's next witness. Woods stated that he drove Appellant to the football game on the night in question. Woods further stated that he, Hunter, and Appellant left the stadium and went to Taco Bell® after the game. Woods testified that he and Appellant were together the entire time and that Appellant did not participate in any fights. On cross examination, Woods stated that Appellant is not a gang member

Tyler Police Department Detective Wayne Thomas testified next on Appellant's behalf. Thomas testified concerning his investigation of the assault on Ervin. Thomas further testified that he had received telephone calls from persons claiming to have information concerning the Ervin assault. Thomas said that the State had not called him to testify concerning his investigation. On cross examination, Thomas testified that he had recently transferred to the department's Narcotics Unit where he was involved in undercover work. Thomas further testified that through the course of his investigation, he ultimately concluded that Appellant committed the charged offense. Following Thomas's testimony, Appellant rested.

Miller was recalled as the State's only rebuttal witness. Miller testified that Hunter is a

8

known associate of the Westside Crips. Miller further testified that he interviewed Appellant during the course of his investigation. Miller stated that during the interview, Appellant never told him he had gone to Taco Bell® that night, but rather, admitted that he was in the area in which Ervin was attacked.

*Analysis*

Examining the aforementioned evidence in the light most favorable to the verdict, we conclude that the jury could have determined beyond a reasonable doubt that Appellant was actively involved in the aggravated assault on Ervin or was a party to that offense. D.T. testified that when he spoke to authorities on the night in question, he thought he heard that a person known as "Polly" was "in on the assault" and that everything he told authorities that night was truthful. T.C. testified that he told authorities that "Polly" was involved in the attack on Ervin. A.T. stated that Appellant was among the people who attacked Alvin Gordon and that she told law enforcement at that time that she saw the same group, including Appellant, then run about three feet away from her and begin beating "another guy." J.A. testified that it was her understanding of gang behavior that if one member of a gang fights, then all gang members have to fight. J.A. further testified that Appellant was a member of the Westside Crips as were the other people who attacked Ervin. L.W. stated that "Polly" was among those who beat Ervin on the night in question. Turner testified that D.T. told him that, among others, an individual they knew as "Polly" assaulted Ervin. Turner further testified that T.C. agreed with D.T.'s assertion that "Polly" assaulted Ervin.

Finally, Miller stated that J.A. told him Appellant was involved in Ervin's assault. A tape recording of Miller's interview with J.A. supports his testimony. Miller further stated that T.A., T.T., and D.T. identified Appellant as being involved in Ervin's assault. He also testified that L.W. and A.T. identified Appellant as being involved in the prior assault and further informed Miller that the same group who perpetrated the prior assault then assaulted Ervin. Miller explained that, based on his investigation, he concluded that Appellant was actively involved in the assault as opposed to being a mere "cheerleader" and that it was his expert opinion that Appellant committed an assault against Ervin by hitting or kicking him as a member of criminal street gang. Therefore, we hold that the evidence was legally sufficient to support the trial court's judgment.

**Factual Sufficiency**

Turning to Appellant's contention that the evidence is not factually sufficient to support the jury's verdict, we must first assume that the evidence is legally sufficient under the *Jackson* standard. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We then consider all of the evidence weighed by the trial court that tends to prove the existence of the elemental fact in dispute and compare it to the evidence that tends to disprove that fact. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Although we are authorized to disagree with the trial court's determination, even if probative evidence exists that supports the verdict, *see Clewis*, 922 S.W.2d at 133, our evaluation should not substantially intrude upon the trial court's role as the sole judge of the weight and credibility of witness testimony. *Santellan*, 939 S.W.2d at 164. Where there is conflicting evidence, the trial court's verdict on such matters is generally regarded as conclusive. *See Van Zandt v. State*, 932 S.W.2d 88, 96 (Tex. App.– El Paso 1996, pet. ref'd). Ultimately, we must ask whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine our confidence in the trial court's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *see also Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006) (evidence is factually insufficient only when reviewing court objectively concludes that the great weight and preponderance of the evidence contradicts the verdict).

In the instant case, Appellant argues that certain witnesses testified at trial that they did not see Appellant among the group of people who assaulted Ervin. Furthermore, Appellant argues that the jury would have had to entirely disregard the testimony from Hunter and Woods that they had accompanied Appellant to Taco Bell® that night

We have reviewed the record in its entirety. We iterate that our evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony, *see Santellan*, 939 S.W.2d at 164, and where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *See Van Zandt*, 932 S.W.2d at 96. Indeed, multiple witnesses vacillated in their respective accounts of the events between the time of the attack on Ervin and trial, and even between their testimony on direct examination and cross examination. However, the jury also heard testimony that the Westside Crips were known to use

threats and coercion in an effort to intimidate witnesses who testified against them. In fact, A.T. testified that she received a phone call at 2:00 a.m. the morning of trial from a caller who told her not to testify or that something "would get done" to her and her family and that the caller knew where she lived. A.T. testified that this was not the first instance in which she had been threatened with regard to her testifying about what she saw that night. As such, the jury could have reasonably determined that witnesses who changed their stories or whose recollection of events on the night in question had drastically changed had been similarly intimidated. The jury could have further determined that certain witnesses were simply more credible than others or that they, by their respective testimonies, portrayed a more accurate representation of the events as had, in fact, occurred than had other witnesses. *See* ***Thompson v. State***, 54 S.W.3d 88, 97 (Tex. App.–Tyler 2001, pet. ref'd) (jury was entitled to find one witness more credible than another or one witness's version of the story more accurate than version of the story offered by another).

In sum, our review of the record as a whole, with consideration given to all of the evidence, both for and against the jury's finding, has not revealed to us any evidence that causes us to conclude that the proof of guilt is so obviously weak or is otherwise so greatly outweighed by contrary proof as to render Appellant's conviction clearly wrong or manifestly unjust. Therefore, we hold that the evidence is factually sufficient to support the trial court's judgment.

Appellant's sole issue is overruled.

### DISPOSITION

Having overruled Appellant's sole issue, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered April 15, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

11